**SEA–LAND SERVICE, INC.**

v.

**The UNITED STATES.**

No. 473–72.

United States Court of Claims.

March 20, 1974.

Gerald A. Malia, Washington, D. C., atty. of record, for plaintiff. Ragan & Mason, Washington, D. C., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant. William A. Mogel, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DURFEE, Senior Judge.

Sea-Land Services, Inc., a Delaware corporation, petitions this court to set aside an adverse final opinion and order[1] of the Assistant Secretary of Commerce for Maritime Affairs[2] (the "Assistant Secretary" or "MARAD"). The dispute involves the exchange of three vessels owned by plaintiff in return for three vessels owned by defendant, pursuant to the parties' contract, under the authority of the Vessel Exchange Act.[3] Sections 1 and 2 of the Wunderlich Act[4] provide the standard for judicial review. For the reasons hereinafter discussed, we conclude that the decision of the Assistant Secretary in this case was correct, that plaintiff's motion for summary judgment must be denied and that defendant's cross-motion for summary judgment must be granted.

I

On May 13, 1965, Sea-Land entered into Contract No. MA–3856 (the "Exchange Contract") with the United States for the exchange of three of its vessels, the CHATHAM, COLORADO and FANWOOD (the "exchange" or "traded-in" ships) for three Government-owned vessels, the ARIZPA, WA-

COSTA and WARRIOR (the "transfer" or "traded-out" ships). The ultimate issue in this case is whether the values assigned by the contracting officer to both the exchange and transfer ships were "fair and reasonable" as required by the Vessel Exchange Act, 46 U.S.C. § 1160(i)(2) (1970).

The transfer ships which were to be traded out to Sea-Land were to be converted into containerships and were therefore not immediately available for commercial operation. For that reason, the parties entered into Use Agreement Contract No. MA–3857, under which MARAD chartered the traded-in vessels back to plaintiff, permitting it to retain and operate those ships in United States foreign and domestic commerce until the traded-out vessels were converted into containerships. The Exchange Contract and the Use Agreement were executed simultaneously, on May 13, 1965, the date of exchange.

The vessels' service was not interrupted for drydocking and condition surveying; the ships were assigned the following "unadjusted fair and reasonable values" as of the date of exchange, based upon the findings of MARAD's Ship Valuation Committee:

### Exchange Ships

| | |
|---|---:|
| CHATHAM | $468,000 |
| COLORADO | 453,750 |
| FANWOOD | 458,500 |
| TOTAL | $1,380,250 |

### Transfer Ships

| | |
|---|---:|
| ARIZPA | $444,250 |
| WACOSTA | 444,250 |
| WARRIOR | 453,750 |
| TOTAL | $1,342,250 |

These values were agreed to by both parties and were embodied in Article 4 of the Exchange Contract.

---

1. U.S. Department of Commerce, Maritime Administration/Maritime Subsidy Board Docket No. CA–43.

2. *ex officio*. Maritime Administrator, U.S. Department of Commerce.

3. The Vessel Exchange Act, Pub.Law No. 86–575 (July 5, 1960), 74 Stat. 312, 46 U.S. C. § 1160(i) (1970), was an amendment to the Merchant Marine Act of 1936, 46 U.S.C. §§ 1101 et seq., (1970).

4. 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1970).

The parties agreed in the Exchange Contract that Sea-Land would accept title to the transfer ships on an "as is, where is" basis, and that the "unadjusted" fair and reasonable values of the transfer ships would be their fair and reasonable values. In short, the values assigned to the traded-out vessels by MARAD's Ship Valuation Committee would be their final values for purposes of the vessel exchange.

On the other hand, the parties agreed for an adjustment to be made to the values the Ship Valuation Committee had assigned to the exchange vessels. The unadjusted values of the exchange vessels were to be reduced by the cost of in-class repairs found to be necessary when those ships were physically delivered to MARAD (hereinafter referred to as "date of redelivery") at the end of the use period. Article 3 of the Exchange Contract provides, in pertinent part:

(b) The "fair and reasonable value" of an Exchange Ship means:

(1) The unadjusted fair and reasonable value of the Exchange Ship as stated and agreed upon in Article 4(a) hereof

\* \* \* \* \* \*

minus

(3) The cost of in-class work necessary on the Exchange Ship, but not performed prior to delivery, as finally estimated by the Contracting Officer, based upon a physical survey of the Ship, taking into account the provisions of Article 7 of this Contract.

\* \* \* \* \* \*

The terms "in-class" and "in-class work" were defined in article 3(c) and (d) of the Exchange Contract, as follows:

(c) The term "in-class", as applied in this Contract to an Exchange Ship, means the condition of the Ship is such as to entitle it to: (1) the highest classification of the American Bureau of Shipping for the specific type ship, and (2) valid Certificates of Inspection for compliance with the regulations of the United States Coast Guard, the United States Public Health Service, and the Federal Communications Commission.

(d) The term "in-class work," as applied in this Contract to an Exchange Ship means drydocking, surveying as required by the regulatory bodies, towage, and other work or services incidental to the survey, and all class requirements found during the course of the survey, as determined by the Contracting Officer based upon the delivery survey, taking into account the provisions of Article 7 of this Contract, but does not include the cost of the Shipowner's surveyors or agents, or any other overhead expense.

The parties agreed that Sea-Land would pay to MARAD the amount by which the values of the transfer ships traded out to Sea-Land exceeded the values of the exchange ships traded in, as determined by the contracting officer after delivery and survey of the exchange ships. Pending the determination of the class work found to be necessary during the course of the survey, Article 4(a) of the Exchange Contract provided for an "estimated" cost of necessary repairs of $40,000 per ship to be deducted from the unadjusted value of each exchange vessel, as required by MARAD regulations.[5] When the Exchange Contract was executed on the date of exchange Sea-Land paid to MARAD $82,000, representing the estimated amount by which the values of the traded-out vessels exceeded the values of the traded-in vessels.

The exchange ships, the CHATHAM, COLORADO and FANWOOD were drydocked, physically surveyed and redelivered to MARAD at the completion of the use (charter) period on April 7, April 22, and August 18, 1966, respectively. Based upon the survey reports, which were signed by representatives of both

---

5. 46 C.F.R. § 375.3(k)(3) (1965).

parties, the contracting officer determined the cost of in-class work required on the exchange vessels was $356,000, $255,000 and $250,000, respectively, for the CHATHAM, COLORADO and FANWOOD. These amounts were deducted from the unadjusted values, after making certain other adjustments to those values required by the contract, to ascertain the fair and reasonable values of the exchange ships. This resulted in final adjusted fair and reasonable values as follows:

CHATHAM ......... $110,116.76
COLORADO .......... 208,513.61
FANWOOD .......... 206,715.33

The contracting officer concluded that Sea-Land owed the United States $816,904.30 less $82,000 paid by Sea-Land when it signed the Exchange Contract, representing the amount by which the total value of the traded-out ships exceeded the total value of the traded-in ships.

Sea-Land subsequently paid, under protest, the balance of $734,904.30, and appealed the contracting officer's final decision within the Maritime Administration,[6] as provided by the Disputes Clause (Article 16) of the Exchange Contract. An initial decision by the MARAD Chief Hearing Examiner,[7] to whom Sea-Land's appeal had been referred for an evidentiary hearing, recommended that Sea-Land be reimbursed in the full amount of $816,904.30 in order to perfect the vessel exchange. On December 7, 1972 the Assistant Secretary issued his final opinion and order affirming the decision of the contracting officer, rejecting the initial decision and recommendation of the Chief Hearing Examiner, and dismissing Sea-Land's appeal with prejudice. Sea-Land now seeks Wunderlich Act review of MARAD's final opinion and order.

MARAD's factual determinations are entitled to finality unless they are determined to be fraudulent, capricious, arbitrary, or so grossly erroneous as to imply bad faith, or are not supported by substantial evidence. 41 U.S.C. § 321; United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L. Ed.2d 652 (1963); Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968). We are not constrained, of course, by MARAD's determinations with respect to matters of law, and are free to reach our own conclusions. 41 U.S.C. § 322; Northwestern Industrial Piping, Inc. v. United States, 467 F.2d 1308, 199 Ct.Cl. 540 (1972); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967); Blount Bros. Const. Co. v. United States, 346 F.2d 962, 171 Ct.Cl. 478 (1965). We are mindful, however, that the construction given to the provisions of the Vessel Exchange Act by the Maritime Administration is entitled to great weight if reasonable. United States v. American Trucking Assoc., Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

As previously noted, the ultimate question in the case is the fair and reasonable values of the transfer and exchange ships. The first disputed issue relevant to that question concerns the reduction of the unadjusted values assigned to the exchange ships by the cost of placing those vessels in class. Plaintiff maintains that MARAD erroneously interpreted pertinent provisions of the Vessel Exchange Act and the Exchange Contract relative to in-class repairs. A second disputed issue involves MARAD's interpretation of the statutory requirement that the fair and reasonable value of the vessels be determined "as of the date of the exchange." 46 U.S.C. § 1160(i)(2) (1970). Plaintiff contends that MARAD erred in failing to rule that the requirement is mandatory. A third disputed issue relates to whether the values of the exchange and transfer ships were required to be calculated "in the same manner," as provided by sec-

---

6. Maritime Subsidy Board Docket No. CA–43.

7. Now entitled "Chief Administrative Law Judge."

tion 510(i)(2) of the Vessel Exchange Act. 46 U.S.C. § 1160(i)(2) (1970). Plaintiff urges us to hold erroneous MARAD's ruling that the valuations were determined in accordance with this provision of the statute.[8]

Defendant asserts a counterclaim in its answer to the petition demanding payment of $986,115, which claimed amount represents the cost of required class and other necessary repairs for which Sea-Land is allegedly liable under Use Agreement Contract No. MA–3857. Defendant subsequently moved to suspend proceedings on the counterclaim until final determination of identical issues involved in a proceeding before the Maritime Subsidy Board. Sea-Land has moved to dismiss the counterclaim.

These issues relative to the main claim and the counterclaim are considered in turn.

## II

MARAD reduced the unadjusted values of the exchange ships by the cost of in-class repairs as determined by the contracting officer upon drydocking, physical survey and redelivery. Sea-Land first of all asks us to assign error to that adjustment in values. The parties specifically disagree as to the meaning of the statutory language which requires the Secretary of Commerce, in determining the fair and reasonable values of the traded-in and traded-out vessels, to consider "* * * the cost of placing the vessels in class with respect

to hull and machinery * * *." 46 U.S.C. § 1160(i)(3) (1970).[9]

At 46 U.S.C. § 1160(i)(2), the Vessel Exchange Act provides as follows:

(2) The fair and reasonable value of the traded-in and traded-out vessels shall be determined, as of the date of the exchange, pursuant to subsection (d) of this section. * * *

Subsection (d) of section 510 of the Merchant Marine Act, 1936, as amended, 46 U.S.C. § 1160(d), provides that such value to be determined shall be based upon a consideration of (1) the scrap value in American and foreign markets, (2) the depreciated value, and (3) the market value for operation in world trade or in foreign or domestic trade of the United States.

The Vessel Exchange Act next provides, at 46 U.S.C. § 1160(i)(3):

(3) In determining said fair and reasonable value the Secretary shall consider *the cost of placing the vessels in class with respect to hull and machinery,* and, with respect to any traded-out vessels of the military type, the cost of reconverting and restoring such vessels for normal operation in commercial service. * * * In determining the value of the traded-in vessel or vessels the Secretary may take into consideration the cost to the owner of compliance with subparagraph (8), clauses (A) and (B), of this subsection. [Emphasis supplied]

Subparagraph (8), clauses (A) and (B) of subsection (i) refers to the expense

8. Sea-Land also argues that MARAD erred in rejecting the initial decision of the Chief Hearing Examiner, which recommended that plaintiff be reimbursed the $816,904.30 previously paid to MARAD. Plaintiff does not contend that MARAD's failure to adopt that decision is error *per se;* rather, we understand it to be plaintiff's position that MARAD erred in not adopting that decision because the Chief Examiner's conclusion as to the fair and reasonable value of the vessels was correct, and his interpretation of the relevant statute, regulations and contract provision s was legally sound.

We are engaged, of course, only to review the administrative decision, *i. e.,* the final

opinion and order of the Maritime Administration, under the Tucker Act, 28 U.S.C. § 1491, in accordance with Wunderlich Act standards, 41 U.S.C. §§ 321, 322. The correctness of the Chief Hearing Examiner's findings and legal theories, to the extent they are now urged by plaintiff, will be considered in the course of this opinion.

9. We here consider the meaning of the statutory terms. The reasons why the parties agreed not to consider the cost of placing the *transfer* vessels in-class is discussed *infra.*

incurred by the owner of the traded-in vessel for deactivating and preparing the traded-in ship for storage and layup and for delivery at a location designated by the Secretary of Commerce.

The Act did not define the terms "the cost of placing the vessels in class with respect to hull and machinery." [10] MARAD's regulations [11] defined the terms in language similar to that included by the parties in the Exchange Contract:

> "In class with respect to hull and machinery" * * * shall * * * encompass all work necessary to place a vessel in such condition as will entitle it to:
>
> (1) The highest classification of the American Bureau of Shipping [ABS] for the specific type of vessel, and
>
> (2) Valid Certificates of Inspection for compliance with the regulations of the United States Coast Guard, the United States Public Health Service [PHS], and the Federal Communications Commission [FCC].

The operating condition of the U.S.-flag vessels is regulated primarily by the ABS regarding classification of U.S. vessels (*see* 46 U.S.C. § 881), by the United States Coast Guard regarding safety and navigation (*see* 14 U.S.C. § 2), by the PHS regarding health (*see* 42 U.S.C. § 269), and by the FCC regarding communications (*see* 47 U.S.C. §§ 351–384). The ABS, a private organization, issues a classification every four or five years for cargo ships operating in U.S. foreign ocean commerce. For such classification ABS requires after the initial ship construction a special periodical survey every four years and compliance with repair items found as a result of the survey. A fifth year of grace before requiring reclassification may be permitted depending on the condition of the ship and the report of its last annual survey. The ships usually do not lose their classification while complying with repair items and may only lose classification by being stricken from the ABS record. The other agencies, the Coast Guard, PHS and FCC, issue certificates of inspection annually or biannually for compliance with their regulations which, if withdrawn or not issued, restrict operation of such vessels.

The traded-in vessels actually possessed the highest ABS classification at the time they were redelivered to MARAD; each of the three ships were generally in the final months of the fifth grace year. They also possessed valid certificates of inspection from the Coast Guard, PHS and FCC. Nonetheless, the reports based upon the physical survey of the ships at the time of redelivery indicated numerous class requirement repair items for each of the vessels, including some "presently outstanding" repair items under ABS requirements.[12]

Plaintiff argues as follows: that the statute clearly provides that the "class" allowance authorized is for *placing* the vessel in class, not for *retaining* the vessel in class or for *prolonging* the "in-class" status for some future period of time; that the requirement only applies to instances when vessels are not in-class (*i. e.*, when they do not possess ABS classification and valid regulatory certificates), and since the CHATHAM, COLORADO and FANWOOD all possessed ABS classification and valid regulatory certificates on the date of exchange and when redelivered, the requirement did not apply to them; that Sea-Land's liability (for which it assumes responsibility) is limited to one "outstanding" class recommendation on the CHATHAM.

---

10. The parties are unable to cite us to any testimony at the legislative hearings which would aid us in unlocking the meaning of these terms, and our own investigation of the legislative history has led us to none.

11. 46 C.F.R. § 375.2(d) (1965).

12. "presently outstanding" repair items refers to those items already determined by the ABS to be needed but allowed to be deferred.

The Government asks us to affirm MARAD's final opinion and order by interpreting the statutory language "the cost of placing the vessels in class" to mean the cost of all class work necessary to place the vessels in condition, as determined at the date of redelivery, to entitle it to the highest ABS classification and valid certificates from the Coast Guard, PHS and FCC.

■ It is a familiar policy in the construction of statutes that the meaning of particular terms used is to be derived not only by consideration of the words themselves, but also of the context, the purpose of the law, and the circumstances under which the terms were used. Puerto Rico v. Shell Co. (P.R.), Ltd., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937). This rule serves as a guide to direct our inquiry into legislative intent.

The Vessel Exchange Act amended the Merchant Marine Act of 1936 to authorize the exchange of certain privately-owned vessels for more modern and efficient vessels owned by the United States. The primary purpose of the legislation, as stated therein, was " * * * to improve the type and suitability of vessels operating in the domestic and foreign commerce of the United States, and to further the policies of this chapter." [13]

The statute sets forth the "conditions" to which the contemplated exchanges are subject in nine subparagraphs. Subparagraph (2) provides for the determination of the fair and reasonable value of the traded-in and traded-out vessels, and subparagraph (3) provide that "[i]n determining said fair and reasonable value the Secretary shall consider the cost of placing the vessels in class * * *." [Emphasis supplied.] The statute emphatically states the reason for inclusion of the provision relative to in-class repairs—the costs of such repairs are to be a factor in the determination of a vessel's fair and reasonable value. The construction we give to the statutory terms must be consistent with, and in furtherance of, the purpose for which they were included in the statute.

■ We conclude that Congress intended the phrase "the cost of placing the vessels in class" to mean the cost of all class requirement work necessary, as determined at the time of the exchange, to put the vessels in a condition which would then entitle them to the highest ABS classification and valid certificates from the Coast Guard, PHS and FCC.[14] Such an interpretation is consistent with the stated purpose of considering the cost of in-class repairs—the determination of a ship's value—because it takes account of the actual condition of the vessel, the only true measure of its value. The standard against which the actual condition of a vessel is measured for the purpose of determining its value is the condition which would entitle it to the highest ABS classification and valid

13. 46 U.S.C. § 1160(i). The purpose for enactment of the original Merchant Marine Act was set forth in its "Declaration of Policy," 46 U.S.C. § 1101, as follows:

"It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine."

14. The relevant point in time under this exchange contract for determination of class work necessary on the exchange ships was the date of redelivery rather than the date of exchange.

certificates from the Coast Guard, PHS and FCC.

Sea-Land's contention that the "in-class" provision of the statute is applicable only in instances when a vessel does not possess ABS classification or valid certificates from the regulatory agencies must be rejected. Such an interpretation of the statutory terms fails to consider them in light of the purpose for considering the cost of in-class repairs —the determination of fair and reasonable values. No measure of value can be derived from the fact that a vessel merely possesses ABS classification or valid certificates at the time of the exchange. ABS classification surveys are conducted only once in four or five years. A vessel's condition with respect to in-class requirements—and hence its value —might be quite different in its fifth year of operation after ABS survey and classification than what it was in its first year of operation after survey and classification. As noted earlier, all three of the exchange vessels involved in this case were in their fifth (grace) year of operation. To accept Sea-Land's contention that the "in-class" provision of the statute applied only when a vessel had never been in class, or had lost its classification, would emasculate the statutory condition that vessels be exchanged on the basis of their "fair and reasonable values." Additionally, such an interpretation would render the "in-class" provision of the statute insignificant and practically meaningless, especially in light of MARAD's finding that it would only be in the "rarest of instances" when a vessel lost its ABS classification or certificates of inspection.[15]

Plaintiff attempts to rely upon A. H. Bull Steamship Co. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520 (1952) and upon Nautilus Shipping Corporation v. United States, 158 F.Supp. 353, 141 Ct. Cl. 391 (1958) in support of its interpretation of the "in-class" provision of the Vessel Exchange Act. Both *Bull* and *Nautilus* concerned the Merchant Ship Sales Act of 1946, 60 Stat. 41 as amended 62 Stat. 1199, 46 U.S.C. § 864a (1970), which required the U. S. Maritime Commission, predecessor to the Maritime Administration, to adjust the statutory sales price of a vessel by deducting the amount estimated by the Commission for "putting such vessels in class." Both cases are inapposite to the issue in the case at bar. If *Bull* and *Nautilus* had held that the "in-class" requirement of the Merchant Ship Sales Act did not apply when a ship possessed valid classification certificates at the date of sale, then those cases might be relevant, by way of analogy, to aid our interpretation of the "in-class" provision of the Vessel Exchange Act. Those cases do not so hold. Neither case mentioned whether or not the vessels involved in the sales possessed valid classification certificates at the times the adjustments to the statutory sales prices were made.

Finally, plaintiff argues that the Exchange Contract does not require adjustment of the unadjusted values of the exchange ships by the cost of all "in-class" work found to be necessary during the course of the survey required at the time of redelivery, but rather that the contract only requires that the cost of "outstanding" class requirements be considered. Plaintiff also maintains that the "in-class" provisions of the contract are ambiguous, and that they should therefore be construed against their drafter, the Government.

We do not find the Exchange Contract ambiguous; on the contrary, the contract sets out in clear and cogent

15. This finding is entitled to finality. 41 U. S.C. § 321; United States v. Carlo Bianchi & Co., *supra*. Plaintiff has not convinced us that it was arbitrary, capricious or unsupported by the evidence merely by citing us to Great American Ins. Co. v. Bureau Veritas, 338 F.Supp. 999, 1003 (S.D.N.Y.1972)

and to United Distillers of America, Inc. v. T/S Ionian Pioneer, 130 F.Supp. 647, 649 (E.D.La.1955), aff'd 236 F.2d 78 (5th Cir. 1956), in which cases it was mentioned that the ships involved therein had lost classification.

terms what was contemplated by the parties. Article 3(b)(3) of the contract provides that in determining the fair and reasonable values of the exchange ships the unadjusted values shall be reduced by—

> (3) The cost of in-class work necessary on the Exchange Ship * * * as finally estimated by the Contracting Officer, based upon a physical survey of the Ship, taking into account the provisions of Article 7 of this Contract.

Article 3(d) of the contract provides that the definition of the term "in-class" work includes "all class requirements found during the course of the survey," as determined by the contracting officer, taking into consideration Article 7 of the contract, Article 7(c) of the contract provides in pertinent part:

> * * * Based upon the survey report there shall be established a listing of in-class work necessary on the Exchange Ship which is not to be performed prior to delivery for the purpose of making the determination required under Article 3(b)(3) of this contract.

The Exchange Contract clearly requires the unadjusted values of the exchange ships to be reduced by the cost of the class requirements found to exist at the time the vessels were surveyed. Inclusion of the above-quoted provisions in the Exchange Contract would be inexplicable if the parties understood the "in-class" provisions of the statute and the Exchange Contract to apply only when a vessel did not possess valid ABS classification and certificates of inspection. The short answer to plaintiff's contention that the contract required only the cost of "outstanding" class requirements to be considered in determining the fair and reasonable values of the vessels is that the contract expressly provides otherwise. The contract states that the survey report would include "*all* class requirements found during the course of the survey" and that the cost of *all* such class requirements would be

considered in adjusting the fair and reasonable values of the exchange vessels. Had the parties intended only that the cost of "outstanding" class requirements be considered, they would have so provided.

Additionally, plaintiff commits the same error in interpreting the "in-class" provisions of the Exchange Contract as it does in interpreting the "in-class" provisions of the Vessel Exchange Act. The true meaning of the terms cannot be determined out of context and without regard to their purpose. The "in-class" provisions were included in the Exchange Contract so that the condition and ultimately the value of the vessels could be determined. Plaintiff's contended-for interpretation of the provisions—that only the cost of "outstanding" class requirements from a prior ABS survey be considered in adjusting the fair and reasonable values of the exchange ships—is inconsistent with the purpose for their inclusion in the contract.

The exchange vessels were drydocked and jointly surveyed by the parties in accordance with Article 7 of the Exchange Contract. Representatives of Sea-Land signed without exception or reservation each survey report with attached lists of deferred class work items. The contracting officer estimated the costs of deferred class work on the CHATHAM, COLORADO and FANWOOD as $356,000, $255,000 and $260,000, respectively, and these amounts were sustained on appeal. Plaintiff has failed to show that these factual findings are arbitrary, capricious or unsupported by substantial evidence; they are therefore entitled to finality and binding upon this court. 41 U.S.C. § 321; *Bianchi, supra.*

### III

Sea-Land and the Government agreed to delay the final determination of the fair and reasonable values of the exchange vessels until redelivery of those ships after the period of charter under the Use Agreement. The parties fur-

ther agreed to the "unadjusted" values assigned to those ships by MARAD's Ship Valuation Committee which, as previously noted, were to be adjusted by the cost of in-class repairs found to exist during the course of the parties' joint survey upon redelivery. Sea-Land now contends that this arrangement was not in compliance with the Vessel Exchange Act, which calls for the determination of the values of the traded-in vessels "as of the date of the exchange." 46 U.S.C. § 1160(i)(2) (1970). Plaintiff argues that the statutory terms must be applied literally and mandatorily.[16]

■ The actual question to be decided is whether the arrangement contracted for by the parties was legally invalid and in derogation of the statutory provision that the ships' fair and reasonable values shall be determined "as of the date of exchange." We conclude that the adjustments made to the values of the exchange ships upon redelivery were not precluded by the statute.

In the first place, the statutorily prescribed requirement was complied with because the exchange vessels *were* valued as of the date of the exchange. It is true, the valuation determination was fixed on an "unadjusted" basis as of that time, but the determination of the final values was deferred, as found by the Assistant Secretary, "largely at Sea-Land's behest so as to afford it continued use of the traded-in vessels." The true condition of the exchange vessels—and therefore their final values— could not be determined until they were free of cargo, drydocked and surveyed. Since the exchange vessels were at sea when plaintiff applied to MARAD to trade them in, and since the traded-out ships were not then available for Sea Land's use, Sea-Land requested postponement of drydocking and surveying, thereby delaying a finalized determination of the ships' values.

■ Plaintiff asks us to apply the statutory terms "as of the date of exchange" literally so as to preclude any and all adjustments to a ship's value subsequent to the date of exchange valuation. This we cannot do because such an unqualified literal application of the statutory provision would defeat the general purpose and policy of the Vessel Exchange Act. Construction of Statutory terms must be consistent with the purpose of the statute as a whole so as to advance and effectuate the legislative design. United States v. American Trucking Assoc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), rehearing denied, 311 U.S. 724, 61 S.Ct. 53, 85 L. Ed. 472 (1940).

The Assistant Secretary concluded that if a final and conclusive trade-in allowance must be established as of the date of an exchange contract, no contracts could be executed until after the traded-in vessels were drydocked and surveyed and deductions for the cost of placing the vessels in class were made. Such a procedure would vitiate the benefits to those shipowners wishing to upgrade their fleets but unable or unwilling to interrupt their commercial service at the date of exchange. This consequence of plaintiff's interpretation of the statutory language in its literal sense would clearly be inconsistent with the purpose and policy of the Vessel Exchange Act.

The Act was passed to improve the type and suitability of U. S.-flag vessels operating in the domestic and foreign commerce of the United States, and to further the policies of the 1936 Merchant Marine Act,[17] including fostering the development and maintenance of a merchant marine sufficient to carry all U.S. domestic and a substantial portion of U.S. foreign water-borne commerce. The reasons why the parties' arrangement to defer a final valuation on the exchange ships was consistent with the

---

16. Both parties agree that the "date of exchange" is May 13, 1965, the day on which the Exchange Contract was executed.

17. *See* note 13, *supra.*

purposes of the Act, and why plaintiff's unimaginative and literal interpretation of the "date of exchange" provision would frustrate the purposes of the Act, were succinctly stated by the Assistant Secretary in his final opinion, at 13–14:

> * * * [The Vessel Exchange Act's] legislative purposes were furthered by the deferred valuation determination since Sea-Land's merchant fleet services continued to operate uninterrupted during the period of reconstruction of the traded-out vessels, thereby providing additional carriage of U.S. foreign waterborne commerce. Contrariwise, an immediate survey would have interrupted Sea-Land's commercial service, diminished U.S.-flag waterborne service until the traded-out vessels were reconstructed, and placed an unanticipated burden upon the owner's opportunity under the Exchange Act to upgrade its fleet.

Courts have not refused to qualify the apparent absolutes of a statutory provision when the harsh and inflexible consequences of literalism would frustrate the patent purpose of the whole act. Church of Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). We conclude that Congress could not have intended the "date of exchange" valuation requirement to be so inflexibly and mechanically applied as to defeat the policy and purpose of the Vessel Exchange Act.

 It is important to again note that the construction given a statute by the officers or agency charged with its administration is entitled to great weight. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The Maritime Administration, by the promulgation of General Order 92, authorized the use of exchange vessels by shipowners under the terms and conditions of use agreements while transfer vessels were being readied for normal operation.[18] The regulations further allowed for adjustment to the unadjusted fair and reasonable value of exchange ships (determined at the date of exchange) by the cost of in-class repairs needed, as determined by survey at the time of actual delivery.[19] MARAD's flexible interpretation of the statutory terms, as implemented through its regulations, to allow the subsequent adjustment to the "date of exchange" value of a vessel which is not available for survey on the date of exchange, is a reasonable interpretation consistent with the Congressional purpose underlying the statute.

 We do not read out of the Vessel Exchange Act the requirement that a ship's fair and reasonable value shall be determined as of the date of exchange. That requirement still stands. We hold only that the requirement is not so inflexible as to preclude adjustment of a ship's fair and reasonable value, determined as of the date of exchange, by the cost of placing the vessel in class, as determined at some later date.

Finally, Sea-Land contends that even assuming *arguendo* that MARAD was correct in "valuing the Exchange Ships as of the date of 'redelivery' in 1966,"[20] MARAD erred in rejecting evidence that the value of C–2 vessels—and therefore the value of the exchange ships—increased during the period between the date of exchange and the date of redelivery in 1966. Plaintiff mistakes what occurred when it argues that the exchange ships were "valued" as of the date of redelivery in 1966. They were "valued" by the Ship Valuation Committee as of the date of exchange, as required by the statute, with in-class "adjustments" to be made as of the date of redelivery. Title to the exchange and transfer ships was transferred as of the date of exchange, and defendant was the owner of the CHATHAM, COLORADO and FANWOOD during the period of claimed increase in market value. Clearly, any in-

18. 46 C.F.R. § 375.3(o) (1965).

19. 46 C.F.R. § 375.3(k)(3) (1965).

20. Petition, at 17.

crease in the market value of the exchange ships after the date of exchange ran to the benefit of the Government, just as any increase in the market value of the transfer ships after the date of exchange ran to the benefit of Sea-Land.

## IV

While the Exchange Contract provided for the unadjusted values of the exchange ships to be reduced by the cost of in-class repairs found to be necessary on the redelivery date, the transfer ships were to be accepted by Sea-Land on an "as is, where is" basis, their unadjusted fair and reasonable values as found by MARAD's Ship Valuation Committee to be final. Plaintiff now asks us to set aside the parties' agreed-to transaction, claiming that it violates section 510(i)(2) of the Act, which provides that the value of the traded-in and traded-out vessels shall be calculated "in the same manner." 46 U.S.C. § 1160(i)(2) (1970).

This provision was inserted as an addition to the original Vessel Exchange Act when the Act was extended on October 10, 1965. It thus became effective five months subsequent to the May 13, 1965 exchange involved in this suit. Sea-Land argues for a retroactive application of this amendment to the May 13, 1965 exchange in that it "effectuates, rather than than changes, the basic policy" of the law. The governing rule, however, is that Congress is presumed to have intended statutes or amendments to operate prospectively unless there is clear statutory expression or legislative history to the contrary. Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457 (1930); Cameron v. United States, 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914). The language of the amendment to the Act does not evidence that Congress intended retroactive application, nor is such an intention manifest in the legislative history.

There is, in any event, a logical explanation to justify the different treatment given the valuation of the transfer and exchange ships. A complete understanding of the transaction entered into under the Exchange Contract requires that account be taken of a previous vessel exchange between the parties. The prior exchange occurred on November 10, 1964. Under Exchange Contract No. MA–3740 McLean Industries, Inc. traded in six vessels to the Government including the ARIZPA, WACOSTA and WARRIOR in exchange for six vessels traded out by the Government to McLean's subsidiary, Waterman Steamship Co. The traded-out ships were to be converted to containerships, and were therefore not immediately available for commercial operation. Accordingly, the parties simultaneously executed Use Agreement No. MA–3741 under which the Government agreed to let Waterman use the six traded-in vessels in its service until the traded-out vessels could be readied for operation. Litton Industries Leasing Corporation was to do the conversions, and thereafter the traded-out ships were to be chartered by Waterman to McLean's other subsidiary, Sea-Land, for operation in the latter's service.

Some time after McLean/Waterman had traded in the ARIZPA, WACOSTA and WARRIOR, McLean decided that their hulls and configurations would be better for conversion to containerships than the CHATHAM, COLORADO and FANWOOD in Sea-Land's fleet. McLean therefore sought to acquire back these three vessels through another ship exchange, the exchange presently in dispute. Since Waterman had authority to operate the three vessels under an unexpired Use Agreement, McLean, Sea-Land, Waterman and Litton proposed that Waterman forego further operation of the three vessels under its Use Agreement and redeliver the same at sea; that the Government accept them "as is, where is," and transfer title to the vessels simultaneously to Sea-Land; that Sea-Land accept simultaneously said vessels, "as is, where is" at sea.

No further adjustments in valuation were made to the transfer ships under Exchange Contract No. MA–3856, and

McLean/Waterman received the unadjusted valuation of said vessels without further adjustment under Exchange Contract No. MA–3740. The arrangement enabled McLean and its subsidiaries to engage in these vessel exchanges, and at the same time left McLean's service uninterrupted. McLean was clearly the real party in interest under both exchange contracts. No purpose would have been served by drydocking and surveying the transfer ships to estimate the cost of in-class repairs. Any adjustment for class work to the values of the ARIZPA, WACOSTA and WARRIOR when those were traded in under Exchange Contract No. MA–3740 would have been identical to any adjustments for class work to those same vessels when they were traded out under Exchange Contract No. MA–3856. The parties took this offset into consideration and simply omitted a procedure which would have caused unnecessary delay and expenditure.

### V

Sea-Land finally argues that MARAD's demand for payment of $734,904.30 as a condition to the processing of certain other unrelated contracts, and that MARAD's retention of that amount (together with the retention of the $82,000 paid to MARAD at the date of exchange) while delaying decision herein until December 7, 1972, are unlawful. Plaintiff offers no evidence or authority to support its assertion that the processing of other contracts was conditioned upon payment under this contract, or that MARAD in any way delayed its decision in the instant case. Plaintiff agreed under Article 2(b) of the Exchange Contract to pay, within ten days of the contracting officer's determination, the amount by which the values of the transfer ships, exceeded the values of the exchange ships. Plaintiff further agreed under the Disputes Clause (Article 16) to proceed diligently with the performance of its contractual responsibilities and in accordance with the contracting officer's decision pending final decision of any dispute. Plaintiff is bound by these terms.

### VI

Defendant interposes a counterclaim in the amount of $986,155 pursuant to Rule 40(a). The claimed amount represents plaintiff's alleged liability under Use Agreement Contract No. MA–3857 for the cost of "in-class" repairs and all repairs necessary to maintain the exchange ships in a "good state of repair and in efficient operating condition and in accordance with good commercial maintenance practices." The Government doubly protected itself by including provisions rendering Sea-Land responsible for the cost of in-class work on the exchange vessels in both the Exchange Contract and the Use Agreement. Any recovery on the counterclaim under the Use Agreement would therefore be reduced by Sea-Land's liability for "in-class" repairs under the Exchange Contract. This means, in effect, that the actual amount sought under defendant's counterclaim is $115,155.

On December 20, 1972, the contracting officer rendered a final decision finding that plaintiff owed the Government $986,155 as the cost of repairs that should have been performed by and at the expense of Sea-Land under Clause 6 of the Use Agreement. He credited Sea-Land with $871,000 for sums already paid for necessary class repairs under the Exchange Contract, and accordingly made a demand on Sea-Land for the balance amount of $115,155. On January 9, 1973 plaintiff appealed that decision, and on July 16, 1973, plaintiff's administrative appeal was docketed (Maritime Subsidy Board No. CA–80) for oral hearing and recommended decision. Thereafter, on July 24, 1973, defendant moved to suspend proceedings on its counterclaim until completion of the administrative proceedings and issuance of a final determination of these issues by the agency. Plaintiff opposes suspension of proceedings on defendant's counterclaim and moves for its dismissal. The parties have advised us since

oral argument that proceedings before the Maritime Subsidy Board on the issue of Sea-Land's liability for repairs under the Use Agreement have been stayed pending our determination of defendant's counterclaim.

Plaintiff grounds its motion to dismiss the counterclaim on the relevant statute of limitations, 28 U.S.C. § 2415(a) (1970), which provides in part:

> (a) * * * every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues * * *.

Assuming the counterclaim would be time-barred because it was brought more than six years after the cause of action accrued, the limitations provision is rendered inapplicable, in any event, by virtue of 28 U.S.C. § 2415(f), which provides, in pertinent part:

> (f) The provisions of this section shall not prevent the assertion, in an action against the United States * * * of any claim of the United States * * * against an opposing party * * * that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. * * *

Plaintiff argues that the facts of the case do not support a finding that defendant's counterclaim arises out of the same "transaction or occurrence" as the main claim. We disagree. Plaintiff points out that the main claim relates to its liability under the Exchange Contract whereas the Government's counterclaim relates to its liability under the Use Agreement. This factor is hardly dispositive of the issue. Two claims arise out of the same "transaction or occurrence" if they are "logically related." Lesnik v. Public Industrials Corp., 144 F.2d 968 (2d Cir. 1944). Although the parties entered into two separate contracts—the Exchange Contract for the swap of the traded-in and traded-out vessels, and the Use Agreement for the charter of the traded-in vessels to Sea-Land while the traded-out vessels were being converted into containerships—they engaged in one single transaction. The two contracts involved the same ships, they were executed on the same day and they incorporated each other by reference. The joint survey of the exchange ships conducted by the parties at the termination of the use period serves as the basis for Sea-Land's repair obligations under both the Exchange Contract and the Use Agreement. The charter of the exchange vessels to Sea-Land under the Use Agreement was the event that deferred final valuation under the Exchange Contract. The facts and circumstances of the case clearly support a finding that defendant's counterclaim arises out of the same "transaction or occurrence" that is the subject matter of plaintiff's main claim. Accordingly, the counterclaim is not time-barred by the provisions of 28 U.S.C. § 2415.

Whether defendant unreasonably delayed in presenting its claim to Sea-Land for the costs of repair obligations under the Use Agreement is yet another matter. It is not apparent from the record before us why the contracting officer's final decision regarding Sea-Land's repair obligations under the Use Agreement was not issued until January 20, 1972, whether this delay was reasonable under the circumstances of the case, or whether the delay was in any way prejudicial to plaintiff. These matters are now before the Maritime Subsidy Board on plaintiff's appeal of the contracting officer's final decision. The administrative agency is the appropriate forum for consideration of these matters in the first instance. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

Defendant filed its counterclaim pursuant to Rule 40(a), which requires inclusion in the answer of any claim defendant has against plaintiff arising out of the transaction or occurrence that is

the subject matter of the petition. The compulsory counterclaim rule was designed to prevent multiplicity of actions, and to achieve resolution in a single lawsuit of all disputes arising out of common matters. Southern Construction Co. Inc. v. Pickard, 371 U.S. 57, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962). The issues raised by defendant's counterclaim should not be considered here now, however, because they are properly and necessarily before the Administrative Agency. *Grace, supra.* It is apparent that defendant filed its counterclaim herein only to protect against a finding by the Maritime Administration that the issues relative to Sea-Land's liability for repairs under the Use Agreement involve a "breach of contract" over which it lacks jurisdiction.

Accordingly, in order to give effect to the policy underlying our compulsory counterclaim rule, and to preserve defendant's rights in the event the Maritime Administration determines that the issues in plaintiff's administrative appeal involve a "breach of contract" over which it lacks jurisdiction, proceedings on defendant's counterclaim will be suspended.

## CONCLUSION

For all the foregoing reasons, the fair and reasonable values of the traded-in and traded-out vessels were those found by the Assistant Secretary, as determined by the Contracting Officer. The decision of the Maritime Administration is supported by substantial evidence, is not arbitrary or capricious, and is not based upon errors of law. It is therefore, by Wunderlich Act standards, binding here. Accordingly, plaintiff is not entitled to recover on its claim. Defendant's cross-motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. Plaintiff's motion to dismiss the counterclaim is denied. Proceedings on the counterclaim will be suspended for a period of six months to await the conclusion of proceedings between the parties pending before the Maritime Adminis-

tration. Defendant's counsel is hereby designated reporting attorney responsible for advising the court, at intervals of 90 days or less, of the status of the proceedings before the Maritime Administration.