**AMERICAN EXPORT ISBRANDTSEN
LINES, INC., et al.***

v.

**The UNITED STATES.**

**No. 402–70.**

United States Court of Claims.
June 19, 1974.

* The nine plaintiffs and the numbers identifying their contracts are:

1. American Export Isbrandtsen Lines, Inc. (now named American Export Lines, Inc.) (AEL)—FMB–87 and MA/MSB–52. [AEL did not join the other plaintiffs in the administrative proceedings and appears here in this case for the first time.]

2. American President Lines, Ltd. (APL)—FMB–50.

3. Farrell Lines, Inc. (FARRELL)—FMB–64.

4. Gulf & South American Steamship Co., Inc. (G&SA)—FMB–75.

5. Lykes Bros. Steamship Co., Inc. (LYKES)—FMB–59.

6. Moore-McCormack Lines, Incorporated (MORMAC)—FMB–48 (Rev.)

7. Prudential-Grace Lines, Inc. (formerly Grace Line, Inc.) (PG)—FMB–49.

8. Prudential Lines, Inc. (now named Prudential Steamship Company, Inc.) (PRUDENTIAL)–FMB–113.

9. United States Lines, Inc. (USL)—FMB–19.

554

———◆———

T. S. L. Perlman, Washington, D. C., attorney of record, for plaintiffs. Richard S. Salzman, Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant. Michael J. McMorrow, Arlington, Va., of counsel.

Before COWEN, Chief Judge, and KUNZIG and BENNETT, Judges.

BENNETT, Judge:

Plaintiffs bring this claim for breach of contract and invoke our general jurisdiction. 28 U.S.C. § 1491. Plaintiffs are operators of ships and have contracts with defendant, now represented by the Maritime Administration, Department of Commerce (MARAD).[1] Pursuant to the Merchant Marine Act of 1936, section 603(b),[2] the contracts provide for operating-differential subsidies (ODS) to reimburse the plaintiff contractors for part of the "fair and reasonable cost of * * * wages * * * of officers and crews." [3] The

---

1. For convenience of reference, additional abbreviations used herein are as follows:
 AMMI—American Merchant Marine Institute
 APL—American President Lines, Inc.
 ARA—American Radio Association
 CDS—Construction Differential Subsidy
 MARAD—Maritime Administration
 MEBA—National Marine Engineers Beneficial Association
 MM&P—International Association of Masters, Mates & Pilots
 MSB—Maritime Subsidy Board
 NMU—National Maritime Union
 ODS—Operating Differential Subsidy
 OGA—Office of Government Aid
 OPP—Office of Program Planning
 PMA—Pacific Maritime Association
 ROU—Radio Officers Union, Commercial Telegraphers Association
 SBB—United States Shipping Board Bureau
 SOA—Staff Officers Association
 USL—United States Lines, Inc.
 WWI—World War I

2. Sec. 603(b), now 46 U.S.C. § 1173(b): "Such contract shall provide that the amount of the operating-differential subsidy for the operation of vessels on a service, route, or line shall not exceed the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense in which the Commission shall find and determine that the applicant is at a substantial disadvantage in competition with vessels of the foreign country * * * in the operation under United States registry of the vessel or vessels covered by the contract over the estimated fair and reasonable cost of the same items of expense * * * if such vessel or vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessel or vessels covered by the contract. * * *."

3. Art. I-4, *Determination of Amount of Subsidy*, of a typical ODS agreement reads: "(a) In order to place the proposed operations of the vessels named in this agreement

purpose of the subsidies is to put the contractors on a parity of cost with foreign competition which with cheap labor operates for much less. In return for the subsidies the contractors agree to provide, for 20 years, specified services on essential trade routes with named vessels and American crews. None of the contracts contain a disputes clause. For purposes of these motions the contracts are substantially similar.

This particular case arises as a result of the decision on August 8, 1968, by the Maritime Subsidy Board (MSB) of MARAD, which denied Grace Lines, Inc. (predecessor to plaintiff Prudential-Grace Lines, Inc.) ODS reimbursement for severance payments made by Grace to personnel who made up the last permanent crews of the Grace vessels SS *Santa Paula* and SS *Santa Rosa*[4] before those vessels were retired by Grace in 1958. Following this decision and subsequent inquiry by plaintiffs, the MSB issued Accounting Instruction 39 (2d Revision) on July 23, 1969. This document detailed the circumstances in which the MSB would consider severance payments made to Maritime employees by any American ship companies to be qualified for ODS reimbursement under section 603(b), *supra*, and article I-4, *supra*, of the ODS agreements between plaintiffs and defendant. The effect of this instruction was to make nonsubsidizable all the severance pay plans

arrived at through collective bargaining by plaintiffs in 1958 and 1961.

Plaintiffs contend that their severance pay costs, arrived at by collective bargaining, are entirely fair and reasonable and thus reimbursable under their contracts. Plaintiffs say that the bargaining was at arm's length and in good faith; that defendant had no legal authority to disallow costs so arrived at; that such disallowance was arbitrary, capricious, and not supported by substantial evidence, was an abuse of discretion, and was erroneous in both fact and law.

Defendant, of course, takes the position that MSB had the authority and the duty under the Act and the ODS contracts to determine independently, for ODS purposes, the eligibility and fair and reasonable cost levels of severance pay expenditures notwithstanding that they were required by plaintiffs' collective bargaining agreements and that defendant properly exercised its discretion, which is final and conclusive. Alternatively, the defendant suggests a remand to the board for reconsideration of whatever the court may determine as the appropriate bases for reimbursement of these expenses.

The foregoing and subsidiary issues will be dealt with hereinafter. However, to set the stage for our legal conclusions which are in favor of plaintiffs, it is first necessary to make a regrettably, but unavoidably, detailed exposition

on a parity with those of foreign competitors and subject to all the terms of this agreement and effective as prescribed in Article I-10 of this agreement, the United States shall, pursuant to Section 603(b) of the Act, pay to the Operator, as Operating-Differential Subsidy, sums equal to the excess of the fair and reasonable cost (as determined by the Board) of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense in which the United States shall find and determine that the Operator is at a substantial disadvantage in competition with vessels of the foreign country hereinafter further described in the operation under United States registry of the vessels covered by this agreement, over the Board's estimate of the fair

and reasonable cost of the same items of expense * * * if such vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this agreement. Subsidy payments shall be based upon rates determined in accordance with Section 603(b) of the Act, which rates the Board determines will place the Operator on a parity basis with his foreign flag competitors. * * * Board determinations under this Article shall be final and conclusive."

4. Plaintiffs' exhibits indicate that approximately $31,598.74 in severance pay was paid to six members of the last crew of the SS *Santa Paula* and approximately $32,521.55 to the last crew of the SS *Santa Rosa*.

of the basic factual circumstances from which this controversy arose and which point the way to its resolution. The essential facts are not in dispute and are all before the court in affidavits and exhibits submitted by the parties and consisting of approximately 3,000 pages which we have examined with care. To the extent necessary for resolution of the issue of liability in the case, the facts are as follows: [5]

### Pre-1936

The problem of shipping has been a perennial one for Americans. From at least the time of the Civil War, this country, the world's largest industrial nation and exporter, has experienced a shortage of American-flag vessels necessary for the commercial and military requirements of this nation. For many years after the United States had embarked on an ambitious naval shipbuilding program, it did almost nothing to develop an adequate merchant marine auxiliary. This shortcoming was ludicrously evidenced in 1908 when President Theodore Roosevelt sent the *Great White Fleet* around the world to demonstrate this nation's eminence as a naval power. His gesture, however, lost much of its lustre since it was humiliatingly necessary for a stream of foreign-flag tender vessels to accompany the fleet in order to service it on its voyage.[6] Such a merchant marine as we have been able to develop is regarded as an instrument of national policy but is operated by private enterprise at considerable cost to the taxpayers for subsidies to keep it going. The effort though large has not been noted for its success.

In 1914 only 19 American-flag vessels operated over trade routes to foreign countries and American possessions.[7] This near total reliance of foreign-flag vessels had an enormous impact on this country when World War I (WWI) broke out. Only by confiscating German ships originally interned in what were neutral United States harbors, and by embarking on a 3-billion-dollar crash building program, was this nation able to meet the transportation requirements brought on by the war. By the time WWI ended, our United States-flag merchant marine was approximately five times the size of our pre-war fleet.

After the war, however, the Government found it difficult to remove itself from the merchant marine business. Ships which had been constructed for the Government-owned merchant marine could not be sold by the Government to private operators because of the post-war decline in the shipping business. Additionally, these vessels had not been constructed to compete efficiently on post-war international trade routes. It was out of this background that Congress passed the Merchant Marine Act of 1928, 46 U.S.C. § 891, et seq., 45 Stat. 689. Congress in this and prior acts demonstrated its belief that it was necessary for the United States to develop a private merchant marine fleet so that it would never again be forced to rely on the ships of other nations to move its commerce in war or peace.

The Merchant Marine Act of 1928, however, fell far short of the hopes of its sponsors. Though it indirectly provided for the payment of subsidies to American-flag shippers through mail contracts, the 1928 Act engendered its share of abuses. When the first mail contracts were negotiated under the 1928 Act, the United States was nearing the tip of its dizzy 1920's economic ascendancy. Contractors awarded themselves large salaries and expense accounts and failed to safeguard themselves against periods of less prosperity and depression. Public opinion against such indirect subsidies quickly grew. Indeed, in 1933 Congress enacted legislation barring the Postmaster General from

---

5. The issue of quantum is not presented by the motions before the court.

6. S.Rep.No.39, 70th Cong., 1st Sess. 2–3 (1928).

7. *Economic Survey of The American Merchant Marine*, U.S. Maritime Commission, Nov. 10, 1937 (Joseph P. Kennedy, Chairman), p. 8.

awarding mail subsidy contracts to any individual, company or corporation "which singly or in combination with other[s] * * * pay any salary or salary combined with bonus, to any officer, agent, or employee in excess of $17,500." June 16, 1933, ch. 101, § 6, 48 Stat. 305; 46 U.S.C. § 891y (1934).

Aside from problems created by the form of the subsidy payments, the 1928 legislation had little apparent effect on United States shipbuilding. The construction loan fund provided for by the 1928 Act was not advantageous enough to encourage the building of many American ships. Only 30 were built in 7 years. A February 24, 1936 Senate report indicated that "[f]or more than 3 years not a single merchant ship for our foreign commerce has been started in American shipyards." [8]

### The Merchant Marine Act of 1936

It was in this factual framework that President Franklin D. Roosevelt sent a message to Congress on March 4, 1935, concerning "whether or not the United States should have an adequate merchant marine." The President gave cogent reasons in the affirmative. He also charged that the mail contract subsidy program was a failure and called it "an unsatisfactory and not an honest way of providing the aid that Government ought to give to shipping." [9] He suggested that Congress end the mail contract subsidy subterfuge and honestly call a subsidy by its right name. Most importantly, he detailed just what the new subsidy plan should cover [10]—

* * * It must be based upon providing for American shipping Government aid to make up the differential between American and foreign shipping costs. It should cover first, the difference in the cost of building ships; second, the difference in the cost of operating ships; and finally,

it should take into consideration the liberal subsidies that many foreign governments provide for their shipping. * * *.

In its report to the Congress, following the President's message, the Committee on Commerce noted that the reasons given by President Roosevelt for the development of a strong and independent merchant marine were "accentuated by the disturbed economic and political conditions existing in Europe and Asia today." [11] The committee warned that if hostilities were to break out, the foreign merchant fleet upon which the United States was dependent for the transportation of two-thirds of its foreign commerce would be withdrawn from the United States trade routes just as it had been in World War I. A new construction program, the committee noted, would also be responsive to the great increase in U.S. Navy shipbuilding then going on. If the Navy was to be expanded, so also must the auxiliary fleet. Otherwise, if hostilities were to arise, the efficiency of the Navy would be greatly diminished as no foreign vessels would be available to service its needs. A 1937 Maritime Commission report prepared in "collaboration with all the defense agencies of the Government" indicated that the U.S. merchant marine service was in a position "second only to that of the armed forces in the maintenance of an adequate defense establishment." [12]

In detailing the basic principles of S. 3500, which became the Merchant Marine Act of 1936, the Senate committee pointed out that approximately 85 percent of the cost of constructing a ship was labor cost. The committee nevertheless thought that it was "wholly desirable that American wage scales and standards of living be maintained in shipbuilding for foreign trade." As to the justification for paying a portion of

---

8. S.Rep.No.1721, 74th Cong., 2d Sess. 4–5, 26 (1936).

9. *Id.* at 2.

10. *Id.* at 2.

11. *Id.* at 5.

12. Economic Survey, *supra* note 7, at 9.

such costs to the ship operator, the committee said: [13]

> * * * It is the purpose of this bill to endeavor to place the American owner and operator of an American flag ship on a competitive parity with his foreign-flag competitor. "Parity" carries with it no guarantee of profits, and if there are to be any profits, they must be made in competition with foreign shipping.

The 1936 Act empowered the Government to enter into contracts with American-flag ship operators to provide an operating-differential subsidy, a construction-differential subsidy, and a special subsidy designed to counterbalance that paid to foreign ship operations by foreign governments. The purpose of each subsidy was to permit American shippers to compete at parity with their foreign counterparts. In return for these subsidies, the Act imposed a number of obligations on the operators, chief among which was the duty to maintain United States registry.

The new legislation did not cause investors to flock to put their money into American-flag vessels. Despite the legislation, the principal obstacle to easy financing—the political vulnerability of subsidized profits—remained. The 1937 Economic Survey [14] addressed this problem:

> * * * The general public does not know that the cyclical nature of the shipping industry requires large cash reserves; nor do people stop to realize that the continuation of private investment requires the payment of profits. The investor cannot be blamed for hesitating to put his money into an industry which, if profitable, is constantly subject to public and congressional condemnation on the ground of excessive subsidy.

When the 1936 Act was passed, labor conditions in the American merchant marine were in desperate straits. Seamen were working long hours for low wages and were berthed in cramped, unsanitary, and poorly ventilated quarters. The great majority of young Americans who made up the excellent, well-disciplined WWI merchant marine crews had left the industry following the war because of the decline in wages and the quality of working conditions. These individuals had been replaced by less qualified personnel. In an attempt to remedy this situation, the Maritime Commission ordered changes in working and safety conditions aboard American-flag vessels. In addition, the 1936 Act included a minimum pay scale for United States seafaring employees. This minimum pay scale was not intended to interfere with seamen's rights to obtain higher wages and benefits through collective bargaining, a right refused seamen from 1926 to 1937. No attention was given in the legislation to setting a maximum level on seamen's wages. Section 301(a) only made reference to "minimum manning scales, * * * wage scales and * * * working conditions." The ODS provision of the 1936 Act, section 603(b), was designed to cover cost increases caused shippers by the improvement in the wages and working conditions of American-flag vessel seamen.[15]

On June 30, 1937, 374 American-flag vessels (of 1,000 gross tons and over), aggregating 2,311,494 gross tons, were engaged in the carriage of dry cargo between the United States and foreign countries. Approximately half of these vessels received no Government aid in any form. Twenty-nine and two-tenths percent (29.2%) of the 1936 ocean-going, dry-cargo trade of the United States was carried in these American-flag vessels. Subsidized vessels carried 54 percent of this trade tonnage. Approximately 88 percent of these vessels would have been obsolescent (over 20 years old) by 1942.[16]

---

13. S.Rep.No.1721, *supra* note 8, at 7.

14. Economic Survey, *supra* note 7, at 36.

15. *Id.* at 43–47.

16. *Id.* at 26–27, 38.

### Subsidy Agreements

World War II brought many of the same problems as World War I. Another crash shipbuilding program was necessary to meet the supply distribution needs of the nation. At the end of the war, this country had approximately 3,700 ships, the largest fleet in the world at that time. This fleet, in ever-dwindling size, has served this nation's shipping needs almost to the present time.[17]

Various American shipping lines entered into ODS agreements with the United States shortly after the enactment of the 1936 Act. Though these agreements have had to be renewed at various times since the enactment of the 1936 legislation, their terms have remained essentially the same. This has been so because the original legislation remained substantially unchanged from 1936 until 1970.[18] Grace Lines, Inc., initially entered into a subsidy contract with the United States on December 31, 1937. Operations under this contract were interrupted by reason of World War II, a contingency provided for in the contract. The 1937 agreement was amended by an agreement executed December 29, 1949, effective as of January 1, 1947. This amended agreement provided, among other things, for the postwar resumption of subsidized operations, subject to the terms and conditions set forth in the contract which was due to expire on December 31, 1957. A 1955 amendment, among other things, "requested" that the applied-for ODS agreement should be entered into at the same time as the execution of a contract for the construction of two new combination passenger-and-cargo vessels (replacements for the SS *Santa Rosa* and SS *Santa Paula*). This new ODS agreement, applicable here, was entered into by the parties on January 17, 1957.

### East Coast 1958 Collective Bargaining

Following a brief resurgence of shipping trade brought about by the Korean conflict, seafaring employment on American-flag vessels began to decline steadily. Maritime employment on United States-flag vessels of 1,000 gross tons or greater decreased to 57,200 jobs on June 30, 1956, the lowest figure since the end of World War II. Shipowners were anxious to transfer their World War II-vintage vessels to foreign-flag operations where labor costs were cheaper. By June 30, 1958, the number of available seafaring positions was down to 51,500. One year later this figure had been reduced further to 50,200.[19]

In view of this continuing decline in seafaring employment, considerable agitation began to be heard to include various forms of job protection in the labor contracts negotiated between the shippers and maritime employees. Unlike the situation in many other industries, maritime employees had no clearly defined, legally enforceable seniority system or reemployment rights to protect their positions when a vessel was retired or sold to a foreign-flag operator. Displaced men had no choice but to present themselves to union hiring halls where their names would be placed on a list of men available for work. No "bumping" system existed. Employees were recalled to work roughly in the sequence in which they had lost their jobs. The hiring halls were conducted under a rudimentary industrywide seniority system in which union members were grouped according to length and recency of prior service. Groups with greater seniority were selected to fill job openings before groups with lesser seniority were called.

17. In a speech before the Maritime Conference on May 4, 1970, Roy G. Bowman, general counsel to the Maritime Administration, revealed that in 1970 this nation had 650 ships in the foreign trade of the United States. Of these, more than three-quarters were over 20 years of age. Mr. Bowman predicted that the U.S. fleet would decline to approximately 272 ships by 1973.

18. The Merchant Marine Act of 1970, Pub.L. 91–469, 84 Stat. 1018.

19. Annual Report of the Federal Maritime Board and Maritime Administration, *1956*, p. 20; *1958*, p. 15; *1959*, p. 14.

Within a group, hiring was governed by length of unemployment. It came as no surprise, then, that the issue of severance pay for displaced maritime employees was raised along with a number of other job protection items in the 1958 round of collective bargaining between the American Merchant Marine Institute (AMMI) and the National Marine Engineers Beneficial Association .(MEBA). AMMI was a trade association of owners and operators of a substantial portion of the United States merchant fleet.[20] Its principal function was to represent owners and operators in labor negotiations with unions representing the crews of ships owned and operated by AMMI members. MEBA was the collective bargaining agent for all licensed engineer officers of plaintiffs Farrell Lines, Gulf & South American, Lykes Bros., Moore-McCormack, United States Lines, and Grace Lines.

MEBA proposed a number of measures at the 1958 bargaining, all designed to provide more employment for its members. These included an expanded vacation schedule, a demand for the employment of additional engineers on certain vessels, the right to extend their contract to foreign-flag vessels controlled by American interests, and, as a relatively minor matter, the right to some form of severance compensation when American-flag vessels were sold to foreign interests. Even though federal mediators were appointed to aid the AMMI–MEBA collective bargaining, the two parties were unable to settle their differences by the time their previous contract expired. MEBA went out on strike on June 15, 1958. This strike had the effect of shutting down work on every ship where MEBA members were part of the crew.

Labor-management relations in the merchant marine industry were by no means uncomplicated or amicable in 1958. The multiplicity of labor unions, the great number and diversity of shipowners' groups, foreign competition and technological advances in the industry set against the various applicable labor laws made negotiations between labor and management a most difficult process. Management was required to hire only American citizens on American-flag vessels [21] and was only able to hire through unions such as MEBA. The workers were surely united and a strike by one almost always amounted to a strike by all. In such an atmosphere, a strike by one union would easily immobilize a ship. In addition to these factors, collective bargaining in the industry tended to be diverse and fragmented. Each union carefully watched the results of the bargaining of its fellow unions and then sought to improve on those results in its own bargaining.

On June 20, 1958, after 5 days of strike, AMMI and MEBA reached an understanding on the major issues between them, agreeing to negotiate the remaining unsettled issues while the men returned to work. Among the issues not decided prior to June 20 was that of the suitability and practicability of severance pay and what form such a plan should take if approved. AMMI continued to oppose the adoption of such a plan while MEBA pressed strongly for it. AMMI was concerned about the cost of such a plan, but was also cognizant of the cost to it of a long and drawn out strike. Too, the Government was pressing for a prompt settlement of the dispute. MEBA, on the other hand, had given up the extension of its contract to foreign vessels so was doubly con-

---

20. AMMI acted for Farrell Lines, Inc., Gulf & South American Steamship Co., Lykes Bros. Steamship Co., United States Lines, Inc., the east coast based ships of Grace Line, Inc., and Moore-McCormack Lines, Inc., in dealing with the unlicensed personnel of some of its east coast based ships and the licensed personnel of all of its east coast based ships, and for American Export Isbrandtsen Lines, Inc., in dealing with certain licensed personnel and all unlicensed personnel.

21. 46 U.S.C. § 1132(a).

cerned that it obtain some job protection benefit in the new contract.

### The Shipman Plan

When the severance pay issue could not be resolved through negotiation, the matter was submitted to binding arbitration before Mitchell M. Shipman, the impartial arbitrator under the engineers' contract. This submission was made pursuant to a clause in the June 20, 1958 settlement agreement between the two parties.

It should be noted that AMMI was negotiating with MEBA over salaries and other fringe benefits paid to employees on subsidized vessels and also on non-subsidized vessels. This situation was common throughout the industry. Not every American-flag vessel was a subsidized vessel. Nor was every sailing by such a vessel a subsidized sailing. Also, not all trade routes were subsidized. Sailings had to be approved by the United States before they were eligible for subsidy and some voyages simply did not qualify. As a result, it was certainly in AMMI's best interests to bargain at arm's length with unions representing its seafaring employees. While the Government might provide the difference in costs of AMMI–member subsidized voyages, AMMI members were still responsible for all of the charges on those voyages which did not qualify for subsidy.

The Shipman severance pay arbitration took nearly a year to conclude. Each side was given an opportunity to present its position in the controversy. On July 9, 1959, Shipman concluded that: [22]

A severance pay program * * * [was] suitable and practical for the li-

censed engineers covered by the collective bargaining agreements between the Union and the respective Companies.

He also determined the basic provisions of the severance plan, as provided in the June 20, 1958 agreement. The plan which AMMI and MEBA incorporated into their agreement on July 22, 1959, included the following excerpt from the Shipman award: [23]

Whenever a Company transfers a vessel to foreign registry, it shall give severance pay to the regular licensed engineers assigned to such vessel.

A transfer of a vessel shall include any disposition thereof regardless of whether (a) it occurs when the vessel is in active operation or in a laid-up status; and (b) is made directly by the Company or by the Company to an affiliate or subsidiary, which, in turn, makes the disposition to foreign registry.

The regular licensed engineers entitled to severance pay shall be the full complement of licensed engineers permanently assigned to the vessel at the time of its last regular full voyage preceding the transfer, regardless of whether they were actually working on the vessel during said voyage.

This plan, by its many terms, only applied to sales or transfers to foreign operators. It had no application to instances where an American-flag operator simply retired or laid-up one of its ships. In an affidavit submitted in this case, Shipman indicated that he fully considered the AMMI argument that severance pay should not accrue to seamen who suffer no economic loss arising out of the sale or transfer foreign of an American-flag vessel. Shipman ex-

---

22. Opinion and Award In the Matter of the Arbitration between Committee for Companies and Agent (Dry Cargo), Atlantic and Gulf Coasts, Atlantic and Gulf Tanker Companies and The National Marine Engineers' Beneficial Ass'n, July 9, 1959. [Vol. II at 387, Affidavits with Exhibits in Support of Plaintiffs' Motion for Summary Judgment.]

NOTE: The Affidavits with Exhibits in Support of Plaintiffs' Motion for Summary Judgment consist of 7 volumes. Hereafter, where citations to Volumes I through VII are used, they refer to these Affidavits and Exhibits.

23. Id.

plained his consideration of this question: [24]

8. \* \* \* In considering these matters I concluded that the MEBA severance program should not exclude rehired engineers from the severance benefits otherwise due them upon loss of their old jobs through the sale or transfer of the ships to foreign registry, nor should the employer's acquisition of new ships affect the benefit. An important element in my reasoning on this issue was the sharp difference between the maritime industry and other industries with which I am familiar in respect of reemployment rights. The marine engineers who had lost their jobs as a result of sales and transfers of their ships to foreign registry had no reemployment rights under their collective bargaining agreement. On the other hand, collective bargaining agreements covering shore-side industries do normally provide that employees who lose their jobs because of the sale or closing of a plant or department will enjoy various reemployment rights under seniority systems. \* \* \*.

The AMMI–MEBA agreement set the stage for the remainder of the 1958 round of employer-union collective bargaining. The International Association of Masters, Mates & Pilots (MM&P), a trade association representing most of the licensed deck officers aboard the ships of the American Merchant Marine, and AMMI entered into negotiations in mid-summer 1958. MM&P entered into its east coast negotiations asking that it be given substantially the same agreement as that concluded between AMMI and MEBA.

Shortly after the AMMI–MM&P negotiations began, a group of unsubsidized operators who normally were represented in negotiations by AMMI, broke off and conducted separate negotiations with the union. These separate negotiations produced an agreement known as the "Mobile agreement," which was more favorable to MM&P than the east coast MEBA agreement or the west coast Pacific Maritime Association (PMA)—M&P agreement which had just been concluded. MM&P insisted at this juncture that AMMI accept the terms of the Mobile agreement. AMMI refused and a strike followed when the AMMI–MM&P contract expired on September 30, 1958.

On October 6, 1958, the parties agreed to submit their dispute to arbitration conducted by Mr. George Meany, president of the AFL–CIO. Meany found that the agreement between the parties should be the same as the west coast PMA–MM&P agreement, with certain provisions of the Mobile agreement added. Meany noted that the severance pay issue was still being negotiated by AMMI and MEBA, with arbitration under Mr. Shipman required if the parties were unable to settle that dispute by a certain date. As part of his award, Meany directed that the AMMI–MM&P negotiations regarding severance pay be bound by the outcome of the AMMI–MEBA negotiations and possible arbitration. In making such an award, Meany implicitly recognized the parity principle long applicable to such agreements.

When the Shipman award was rendered on July 9, 1958, it automatically became part of the east coast MM&P agreement.

The Shipman award was also incorporated into the 1958 AMMI agreements with the American Radio Association (ARA), by memorandum dated September 1, 1960, and the Radio Officers Union of the Commercial Telegraphers Association (ROU), by an agreement dated May 12, 1960. The Staff Officers Association (SOA), representing all pursers except the chief purser, did not press the matter of inclusion of the Shipman award until the renewal of their AMMI agreement on October 2, 1961. Thus, by the formation of the 1961 agreements, the Shipman award was included in all

the east coast merchant marine officers' collectively bargained labor agreements.

### Circular Letter 8-60

On November 9, 1960, the Maritime Administration issued its Circular Letter No. 8-60 directing subsidized shipowners to explain and justify to MARAD as fair and reasonable all collective bargaining agreements thereafter made resulting in increases in subsidizable wage costs. This directive came, no doubt, in response to congressional criticism of skyrocketing subsidy costs. This matter had come to a head in the 84th Congress (1955–56) when serious congressional consideration was given to legislating a maximum to which the Government would subsidize wages, manning scales, and working conditions for all officers and crews serving on ODS-qualified vessels.

From 1936 until 1955 MARAD had been in the habit of accepting collectively bargained wage agreements as ipso facto "fair and reasonable" under the terms of the 1936 Act and the various subsidy contracts (see article I–4, footnote 3).[25] This policy did not give rise to any serious problems until the mid-50's. The increase in wages and fringe benefits was then thought, in part, to be responsible for the decline of the American merchant fleet. Charges were leveled that less-than-good-faith bargaining was taking place as a result of the fact that government subsidies were paid for any wage or benefit increase obtained through collective bargaining.

Congressional desire to institute maximum subsidy levels, reflected in legislative proposals, found no support from those who would be directly affected by such legislation. The Maritime Administrator testified in opposition to H.R. 5734, indicating that the "fair and rea-

sonable" language of section 603(b) of the 1936 Act gave the MSB sufficient authority to impose such maximum wage levels on its own. This determination was seemingly contrary to another statement by the Administrator that [26]—

> * * * the legislative history of the 1936 act tends to indicate that the phrase "fair and reasonable" is the result of an agreement reached across the bargaining table.

Mr. Francis T. Greene, president of AMMI, opposed the legislation for a number of reasons: [27]

> * * * (1) The undesirability in peacetime of Government control of wages, (2) the limited scope of control provided by the bill would make it unsuccessful in achieving its aim, and (3) the powers provided for in the bill would be so exercised as to impair the principle of parity which is the foundation of the 1936 act. * * *.

Together with his opposition to the bill, H.R. 5734, Greene also suggested that the MSB could set a maximum level on wages under the "fair and reasonable" clause of section 603(b). Union representatives, too, opposed the proposed legislation.

In its report, the Merchant Marine and Fisheries Committee made the following recommendations pertinent here: [28]

> 4. Immediate steps should be taken by the Federal Maritime Board to establish procedures under which determinations will be made that amounts paid out by the Government pursuant to operating-differential subsidy contracts are "fair and reasonable" within the meaning of section 603(b) of the Merchant Marine Act, 1936, as amended. * * *. This principle is applicable to each and every subsidizable item.

25. Labor-Management Problems of the American Merchant Marine, Hearings before the House Committee on Merchant Marine and Fisheries on H.R.5734, 84th Cong., 1st Sess. 21 (1955); H.Rep.No.1658, 84th Cong., 2d Sess. 23 (1956).

26. Hearings on H.R.5734, id. at 98.

27. H.Rep.No.1658, 84th Cong., 2d Sess. 23 (1956).

28. H.Rep.No.1658 (on H.R. 5734), 84th Cong., 2d Sess. 31 (1956).

5. In its consideration of amounts reimbursed under subsidy contracts for wages paid to officers and crews, the Maritime Board shall make a completely independent determination that the amounts paid are fair and reasonable under the statute, and the mere fact that payment was made pursuant to a provision in a collective-bargaining agreement shall not be regarded as conclusive evidence of fairness and reasonableness, although weight should be given to such circumstances. * * *.

Despite considerable activity, the final report of the committee did not recommend passage of H.R. 5734 and the bill *never* emerged from committee. As a result of the hearings, however, MARAD apparently believed it had been put on notice by Congress of its duty to take a completely independent look at subsidies claimed by shippers; hence, Circular Letter No. 8–60.[29]

From the foregoing, defendant takes the position that the board had authority under section 603(b) of the Act to make an independent determination as to whether plaintiffs' costs were fair and reasonable; that Congress confirmed this in its hearings and H.Rep. No.1658, 84th Cong., 2d Sess., in 1955–1956; that Congress insisted the authority be used; that plaintiffs, through their trade association AMMI (Mr. Greene), conceded the board had this authority and plaintiffs were on notice it would be used; and that expenses incurred by collective bargaining were not per se fair and reasonable.

## The Shaughnessy Arbitration

At oral argument and in their briefs, both parties informed the court that all questions pertinent to a decision in this case were raised by the 1961 sales to a Greek corporation of the Grace vessels, SS *Santa Rosa* and SS *Santa Paula*. These vessels were originally decommissioned in 1958 and were immediately replaced in the Grace American-flag fleet by two new vessels of the same name built under the 1936 Act's construction differential subsidy (CDS) program. From 1958 to 1961, Grace maintained the two old vessels in a "mothball" status. Skeleton crews serviced both vessels during this period.

AMMI, as representative for Grace, made an attempt during the 1961 round of collective bargaining to obtain MEBA's acknowledgment that the sale of the *Santa Rosa* and *Santa Paula* did not fall within the terms and conditions of the Shipman severance pay award. MEBA, however, refused to sign the 1961 agreement until AMMI acknowledged that the two vessels were covered by the Shipman award. AMMI made such an acknowledgment, but reserved its right to offer any defenses against claims for severance.

Following the sale of the two laid-up vessels in 1961, the individual engineers who had made up the crews of the two ships during their last voyage in 1958 applied for severance pay benefits under the Shipman arbitration award. These engineers contended they were part of the "full complement of licensed engi-

**29.** Paragraph two of the Circular Letter states: "Under Section 603(b) of the Merchant Marine Act, 1936, as amended, it is the duty of the Federal Maritime Board to determine that items of vessel operating expense for which subsidy is paid are 'fair and reasonable.' The mere fact that the items of expense is covered by a contract or collective bargaining agreement does not, ipso facto, make it 'fair and reasonable.' The Federal Maritime Board, therefore, at a meeting held on October 10, 1960, directed that each subsidized operator be advised that the Board will not accept, without due explanation and complete justification, increas-es or concessions on the part of the subsidized operators resulting from future collective bargaining, as fair and reasonable. The fact that the United States Government is bearing a substantial portion of the cost of wages and other operating expenses in the form of subsidy is not to be construed as relieving the subsidized operator of its basic responsibility to bargain diligently and prudently with the several Maritime Unions nor as a cause for relaxation of its efforts to maintain operating costs at a minimum level, consistent with the safe, efficient and economical operation of the subsidized vessels." [Vol. I at 21.]

neers permanently assigned to the vessel[s] at the time of * * * [their] last regular full voyage preceding the transfer * * *." Grace refused to make such severance payments, and the matter was referred to arbitration conducted by Dr. D. F. Shaughnessy.

In its defense to the engineers' claim, Grace first asserted that the Shipman award did not apply to the *Santa Paula* since that vessel was in laid-up status prior to the June 1958 Grace-MEBA agreement. It also asserted that the Shipman award did not cover either vessel since both were decommissioned before the Shipman award was made in July 1959.

Dr. Shaughnessy answered these contentions by pointing out that the Shipman award specifically referred to vessels which were in laid-up status at the time of the award and thereafter. As authority for this proposition, Shaughnessy cited two 1961 arbitration awards, wherein Shipman had applied his 1959 award to circumstances involving transfers foreign of vessels belonging to two unsubsidized carriers.[30] On the question of whether acceptance of employment after a decommissioning, but before a sale foreign disqualified an employee for severance benefits, Shipman wrote:[31]

> It is the Arbitrator's view that the right to severance pay vests on the date of transfer of the vessel if the licensed engineer is otherwise eligible. It is immaterial that the engineer did not retain his employment status with the company. * * *. The permanent loss of employment opportunity, which is the essence of the Severance Pay Award remains unaffected.

Grace also argued that the Shipman award should not apply since no crew members severed their employment relationship with Grace as a result of the lay-up and sales of the two vessels and since even more engineering positions than had been eliminated were provided by the replacement of the two old vessels. Though Shaughnessy expressed some reservation regarding the advisability of awarding severance pay to employees who had suffered no job loss as a result of a lay-up and sale foreign, he nevertheless determined that he was bound to apply the terms of the Shipman award. He held that the engineers were covered by the terms of the Shipman plan and became entitled to severance pay when Grace sold its two vessels. Shaughnessy explained his reasoning as follows:[32]

> In the Shipman Award the Arbitrator specifically addressed himself to the question whether employment or an offer for employment with the same employer should be a basis for denying severance pay and the answer was in the negative. He said, in part:
>
> > Further, in the face of the hiring hall system in operation in this industry, it would appear that an offer of a job by a Company to a displaced engineer may simply deprive another engineer of such opportunity. In the shore side analogy, such latter employee would receive the severance pay; but any such provision is, obviously impractical for maritime.

Shaughnessy also pointed out that both the *Edison* and *Dolphin-Traders* arbitration opinions were appealed to the New York Supreme Court and were sustained.

---

30. *See* In the Matter of Arbitration between National Marine Engineers' Beneficial Ass'n and Edison S. S. Corp., April 21, 1961 [Vol. II, p. 532] ; In the Matter of Arbitration between National Marine Engineers' Beneficial Ass'n and Dolphin S. S. Corp. & Traders S. S. Corp., April 21, 1961 [Vol. II at 524].

31. In the Matter of Arbitration between Nat'l Marine Engineers' Beneficial Ass'n and Dolphin S. S. Corp. & Traders S. S. Corp., April 21, 1961 [Vol. II at 528].

32. In the Matter of the Arbitration between Grace Lines, Inc., and National Marine Engineers' Beneficial Ass'n, Oct. 3, 1962 [Vol. III at 858].

In concluding his opinion, Shaughnessy was unequivocal in his holding: [33]

> The Shipment Award does not afford any exception to its application, where a Company which transfers a vessel to foreign registry, acquires another American flag vessel offering an equal or greater number of jobs as compared with the transferred vessel. * * *.

On the advice of its attorney, Grace instituted an action in the Supreme Court of New York, New York County, to vacate and set aside the Shaughnessy award.[34] This request for relief was denied. Grace Line, Inc. v. National Marine Engineers' Beneficial Ass'n, 38 Misc.2d 909, 239 N.Y.S.2d 293 (Sup.Ct. 1963).

In its opinion, the New York court expressed "its profound regret" that MEBA had pressed the severance pay claim. 239 N.Y.S.2d at 298. Nevertheless, the court concluded that it was bound by the doctrine that "an award concludes the parties on all the issues, both of fact and law, submitted to the arbitrator." *Id.* As long as the terms of the Shipman award were reasonably susceptible to the reading given them by Shaughnessy, the court was powerless to overturn the award. *See* National Cash Register Co. v. Wilson, 8 N.Y.2d 377, 383–384, 208 N.Y.S.2d 951, 955, 171 N. E.2d 302, 305 (1960); and cases cited at 239 N.Y.S.2d 298 (*Grace Line, supra*).

This decision was appealed to the Appellate Division of the New York Supreme Court and was affirmed. 20 A. D.2d 759, 246 N.Y.S.2d 994 (1964). Appeal taken to the New York Court of Appeals was denied. 14 N.Y.2d 484, 199 N.E.2d 174 (1964). Certiorari was later denied by the United States Supreme Court. 379 U.S. 843, 85 S.Ct. 83, 13 L. Ed.2d 49 (1964).

*The 1961 Bargaining*

The first industrywide round of collective bargaining occurring after the publication of Circular Letter No. 8–60 came in 1961. AMMI contracts with MM&P, MEBA, ARA and the National Maritime Union (NMU), the representative of unlicensed crew members, expired on June 15, 1961. Despite efforts by the Federal Mediation and Conciliation Service and the Secretary of Labor, Arthur Goldberg, agreement between AMMI and MM&P, ARA and NMU was not reached until July 3, 1961, after a 17-day industrywide strike involving seven unions on both coasts. The strike forced President John F. Kennedy to appoint an emergency board of inquiry under the national emergency provisions of the Taft-Hartley Act. The east coast MEBA strike was not settled until August 23, 1961, after the United States District Court for the Southern District of New York, on petition by the Attorney General of the United States, had on July 3 issued a Taft-Hartley 80-day injunction against MEBA and two west coast unions and the emergency board of inquiry had been reconvened. The board of inquiry was influential in the settlement of all the disputes, even to the point of serving as a sort of arbitrator on particular issues. Severance pay was not an issue in the 1961 strike with any east coast union except NMU. The new AMMI agreement with MM&P, MEBA, and ARA continued to include the Shipman severance pay provisions.[35]

NMU demanded a severance pay provision in its 1961 contract, but AMMI refused. This matter, along with a number of others, became wrapped up in negotiations and "arbitration" conducted by the presidential board of inquiry. The resulting treatment of NMU's request was favorable to the union. Though the settlement did not provide

---

33. *Id.* at 859.

34. The Shaughnessy Arbitration Award was enforceable as a judgment. N.Y.Civ.Prac.L. & R. § 7314 (McKinney 1964).

35. *See* National Emergency Disputes, Labor Management Relations (Taft-Hartley) Act, 1947–1968, U.S. Dept. of Labor, B.L.S. Bull No.1633, pp. 39–42 (Sept. 1969); Vol. I at 12.

for a separate severance plan, as other union contracts had provided, NMU was permitted to use the funds of its Employment Security Fund, established in 1955, to provide severance benefits for its employees. Under the 1955 trust agreement establishing the Employment Security Fund, employees had agreed to pay to the fund 25 cents per day for each day worked by an NMU member on the vessel of a participating employer. Payments were originally intended to provide supplemental unemployment benefits for NMU members. This plan had been administered through the NMU Pension and Welfare Fund by a board of trustees appointed half by the union and half by the participating employers. By 1961, the Pension and Welfare Fund had accumulated a surplus, so it was this fund that the parties agreed to use to provide severance benefits. The Employment Security Fund, as modified by the 1961 contract, covered other instances of job loss besides sales or transfers to foreign registry. Also included were job losses caused by shipwreck, lay-up, sales to other American-flag shippers and manning reductions.

### West Coast Collective Bargaining

Extension of the Shipman plan to west coast unions did not come quite as quickly as it had come on the east coast. MEBA included a request for severance benefits in its 1958 collective bargaining with PMA, the west coast owners' bargaining group. PMA, however, refused to accede to the request and a contract was agreed to with no reference to such benefits. After the Shipman award had been announced, MEBA attempted to persuade PMA to reopen negotiations to include a similar type of plan in the agreement between the two parties but this effort failed. It was not until the 1961 collective bargaining round that the issue was raised again as a mandatory item of collective bargaining. The 1961 west coast round of collective bargaining was one of the most difficult and complex the maritime industry had ever faced. Coalitions of unions requested a number of radical, expensive changes in their employment contracts. PMA was not inclined to agree to any of these proposals and so PMA members were struck by MEBA, MM&P and ARA.

The presidential board of inquiry, *supra*, was instrumental in settling the MEBA contract dispute. PMA had become convinced in the bargaining that was conducted after the June 15, 1961 contract expiration date that it would have to agree to accept a number of economic improvements—as opposed to unions' more radical demands—in order to avoid a long, drawn-out strike. Since MEBA had had a severance plan in its east coast contract since 1959, considerations of parity made it impossible for PMA to hold back on such an item on the west coast. Finally, on July 1, 1961, PMA and MEBA drew up a memorandum of understanding of their settlement.

Though MM&P had originally agreed to bargain with PMA in concert with MEBA, the union withdrew from this understanding shortly before the expiration of its contract on June 15, 1961. MM&P demanded bargaining in San Francisco simultaneous with the New York PMA–MEBA negotiations. MM&P's proposals were unacceptable to PMA and the union went out on strike as soon as its contract expired. The board of inquiry's efforts to negotiate were unsuccessful and MM&P became one of the unions against which the Federal Government sought and obtained an injunction. This injunction, granted on July 3, 1961, brought union members back to work for an 80-day cooling-off period. Once this term had run, however, the union again went out on strike. The principal issue continued to be the union's rotational hiring proposal which PMA continued to reject. It was not until a special three-man panel, appointed by the Secretary of Labor and chaired by the Undersecretary of Labor, stepped in to mediate that the strike was settled. The Shipman sever-

ance plan was included in the contract signed by PMA and MM&P.

In its negotiations, ARA sought to obtain a uniform nationwide contract, including many provisions already contained in its east coast contract. Different work rules on the west coast caused PMA to be unwilling to agree to the ARA proposal. ARA went out on strike on June 15, 1961. When its dispute was not settled by July 3, it was included in the injunction obtained by the Government on that date. PMA's decision to compromise on some economic matters averted a second ARA strike, and a contract between the parties was signed on the eve of the expiration of the 80-day injunction. The new contract included the Shipman severance plan.

As a result of bargaining in 1964, PMA and MM&P reached an agreement that payments due under the Shipman plan would be paid to a committee administering the union's hiring hall. This plan was thought advisable since it spread the benefit of job loss payments across the entire union membership. Similar negotiations with other unions were not successful until 1969, when the engineers and radio officers also agreed that severance payments should be paid into union pension plans unless the displaced employees actually agreed to retire. The pursers agreed to a plan whereby men displaced by a foreign sale were granted bumping rights. If those rights were exercised, then the payments were directed to the union trust fund.

### 1962

On April 11, 1962, Ralph E. Casey, president of AMMI, filed a report with Donald W. Alexander, Maritime Administrator, detailing the results of the 1961 round of the collective bargaining. Casey indicated in the letter of transmittal accompanying his report that such report was filed pursuant to Circular Letter No. 8–60. The Casey report included the 1961 AMMI agreements with MEBA, MM&P, ARA and NMU. Sec-

tion 43 of the AMMI–MEBA agreement referred specifically to the Shipman plan.[36]

Section 43. (1) The parties agree that the terms and provisions of the Shipman Arbitration Award dated July 9, 1959, establishing the severance program shall be deemed to be incorporated as part of the Agreement.

The Shipman plan, furthermore, was set out in full text in section 45 of the AMMI–ARA July 3, 1961 agreement. A memorandum of understanding, also dated July 3, 1961, directing that severance benefits were to be paid to NMU members through the NMU Employment Security Fund, was also included in the materials which Casey turned over to the Maritime Administrator.

Though the defendant now raises some question about whether all this material actually was reviewed by the MSB, it seems clear that the agreements reached their proper destination by August 6, 1962, at the latest. On that date the chief of the Office of Government Aid (OGA) delivered a memorandum to MSB/MARAD which specifically referred to the April 11, 1962 Casey report. Though the OGA memorandum indicated that the Casey report was too long, detailed, and complex for summarization, the report did contain one significant conclusion pertinent to the outcome of this case. The OGA determined that [37]—

\* \* \* it is our view \* \* \* that the subsidized operators, working with and through their committees and organizations, on which non-subsidized operators were fully represented, negotiated diligently and with determination, suffering through a costly strike period until the "cooling off" provisions of the Taft-Hartley Act were invoked on the basis of a threat to the national health and security, and were subject to pressures from the public and Government—as well as economic ones—to reach final settle-

---

36. Vol. II at 664.

37. Vol. VII at 2083–084.

ment with the unions. The reports submitted provide an excellent record of the issues involved and the various factors surrounding the 1961 wage negotiations. While we do not necessarily subscribe to all the statements made, *in our opinion this record fully supports the operators' contentions that the benefits granted to the several unions, under the circumstances, are justified and should be determined by the Board to be fair and reasonable for subsidy accounting purposes.* * * *. [Emphasis supplied.]

An MSB announcement issued November 6, 1962, also indicated that the board was familiar with the results of the 1961 round of collective bargaining. In its directive to "all subsidized operators" approving the 1961 agreements, the board "found and determined" that:[38]

A. The following costs are fair and reasonable and, * * *

(3) the base wages, overtime rates and rates of contribution to the several pension, welfare and vacation funds contracted for in the spring and summer negotiations of 1961 between the Atlantic, Gulf and Pacific Coast subsidized operators and the International Organization of Masters, Mates and Pilots, National Marine Engineers Beneficial Association, American Radio. Association, National Maritime Union of America and Seafarers' International Union, all as set forth in the respective agreements made as of June and July 1961.

B. All other costs contracted for in said agreements identified in "A" above, are fair and reasonable and, if otherwise eligible under the definition of wages of Officers and Crews incorporated in the above-cited Manual of Procedures, shall be eligible for operating-differential subsidy rate-making and subsidy accrual pur-

poses unless specific action to the contrary has been or shall be taken by the Board with respect to a particular cost item.

Finally, a November 16, 1962 Maritime Administration Division of Labor Statistics document—Excerpts of Arbitrator's Comments—obtained by plaintiffs in pretrial discovery, also indicates that defendant was familiar with the Shipman award at that time.

In its brief the Government contends that the MSB was never "formally advised" of the existence of the NMU severance payment program. Defendant admits that "an unsigned text purporting to be the 1961 trust fund regulation amendment was received in the Board's mail room later in that year," but contends that the document failed to come to the MSB's attention through no fault of defendant. Without passing judgment on the efficiency of MARAD's mailroom operations, we think the record reveals that there were other occasions for the board to apprise itself of the existence of the NMU plan and that these occasions occurred long before the September 26, 1969 MSB determination that severance payments made from employer contributions to the NMU Employment Security Fund would have to be refunded.

In the first place, as already noted, a copy of the NMU plan, together with the July 3, 1961 memorandum of understanding of the trustees of the NMU Pension and Welfare Plan and Employment Security Plan, was turned over to the board by Casey on April 11, 1962. Second, a February 20, 1964 OGA and Office of Program Planning (OPP) report to the MSB contained details of the 1963 operation of the NMU Employment Security Fund and referred specifically to $682,000 paid by the fund on "severance claims."[39] Third, a February 19, 1965 AMMI report to MARAD specifically noted that the NMU "Employment Security Plan was amended to provide

---

38. Vol. I at 28–29.

39. MARAD, MSB, "NMU Employment Security Plan," Vol. VII at 2099.

an additional *severance benefit* * * *." [40] [Emphasis supplied.] Fourth, the board specifically referred to the NMU Employment Security Plan at page 26 of Docket A–25 (Revised) issued August 8, 1968.[41] Finally, it strains credulity, in the face of elements contained in the voluminous record submitted in this case, to believe that the board did not know of the NMU severance arrangement until mid-1969, eight years after it had become operative.

### Dockets A–14, A–15, A–16

Under section 45 of the AMMI–MEBA agreement, MEBA was entitled to wage review in 1963. A July 23, 1963 agreement between the two parties extended the contract to June 15, 1965, and readjusted wages, but did not affect the severance pay plan established in the 1961 agreement between the two parties. Pursuant to Circular Letter No. 8–60, Casey requested that MARAD approve as fair and reasonable the increased labor costs resulting from the 1963 agreement. In a July 13, 1965 decision, Docket A–14, MSB approved in part and disapproved in part the resulting costs. The board based its review authority on language in the 1936 Act. It indicated that it had a "limited role in the review of collective bargaining agreements." It stated that[42]—

> * * * [i]ts function is exclusively that of determining how much money will be paid out by the Government under subsidy contracts with shipowners. The Board has no part in shaping the terms of the collective bargaining agreement; * * *. *It merely informs the operators of the elements of the contract which it considers subsidizable.* [Emphasis supplied.]

The board also rejected the proposition that the terms of any collectively bargained agreement were ipso facto "fair and reasonable"[43] In Docket A–14, the board reduced the dollar value of the wages and fringe benefits provisions of the agreement, rejected the pension plan concluded by the parties and refused to subsidize payments to the MEBA training fund and a separate escrow account.

In a companion opinion announced on July 13, 1963, in Dockets A–15 and A–16, the board also disallowed certain payments which were to be made or had been made under agreements between AMMI–NMU and PMA–MM&P and going back as far as 1961.

Plaintiffs protested the three board announcements to the Secretary of Commerce, John T. Connor. Without waiting for plaintiffs' specific objections to the three opinions, the Secretary reviewed the board actions on his own motion and substantially muted their effect. Mr. Connor noted that, in 1964, $177,000,000 was paid to subsidize maritime wages, that this amount constituted 85 percent of the ODS payments made and that the American taxpayer was forced to absorb every increase in maritime wages. Nevertheless, the Secretary reversed the MSB's actions in A–14, A–15 and A–16 on the grounds that the retroactive effect of the board's actions, taken without notice or hearing, would work undue hardships on shippers because of the substantial disallowances contained in the three board opinions.

In concluding his announcement, Secretary Connor detailed procedures with respect to future MARAD review of collective bargaining agreements. These procedures provided that any controversy or contested point regarding subsidy for wages or other items should first be placed before a panel of "disinterested" individuals. It would be the duty of that panel to pass on such items of dispute and to make a report to the MSB for that body's final decision on the matter. Both the panel and the MSB

---

40. AMMI, "A Review of Fringe Benefit Developments from 1961 to Date, February, 1965," Vol. I at 92.

41. Vol. VI at 2033.

42. Vol. I at 36.

43. *Id.* at 37.

were instructed that "the concern to reduce or to hold down the maritime subsidy budget should not be the predominant consideration, * * *."[44]

As a result of Connor's action, agreements reached between shippers and unions prior to 1965 remained substantially unaffected by MSB action. The procedures outlined by Secretary Connor in his July 23, 1965 opinion letter, however, were not followed when the MSB considered plaintiff Grace's claim for severance pay subsidy in 1966 (Docket A–25) and 1968 (Docket A–25, Revised), as we will now see.

### Subsidy Reimbursement

In May 1965, Grace Lines submitted its application for subsidy reimbursement for payments made in connection with the 1961 sales of the SS *Santa Rosa* and SS *Santa Paula*. This claim was rejected on June 7, 1965, by a MARAD district controller. The rejection letter indicated that the severance payments which Grace was required to make pursuant to its MEBA contract did "not come within the definition of wages allowable for subsidy."[45] Shortly after its letter to Grace, MARAD issued Accounting Instruction No. 39 informing "all subsidized operators" that severance payments were not considered "eligible" for ODS.

MARAD noted that this decision had been made by its Office of Government Aid after that office had considered the definition of "wages of officers and crews" contained in the 1957 MARAD Manual of General Procedures for Determining Operating-Differential Subsidy Rates and a 1956 report of the U.S. House of Representatives Committee on

Merchant Marine and Fisheries.[46] The 1957 Manual definition of "wages" relied upon by OGA, and quoted in AI–39, was as follows:[47]

"Wages consist of the *fair and reasonable cost* of payments made by the operators directly to or for the benefit of * * * members of the crew complement and relief complement of *subsidized vessels for services rendered and required for the efficient and economical operation* of such vessels * * *. (emphasis added.)."

Plaintiff protested the adverse board ruling and on April 12, 1966, the board issued Docket No. A–25, Severance Pay for Transfer or Sale of a Vessel to Foreign Registry. In this opinion the board reiterated its authority to review such matters and rejected Grace's protest. The board gave a number of reasons for its decision:[48]

* * * In the present case severance pay made long after layup of the ship on account of the sale foreign of the SS *Santa Paula* and SS *Santa Rosa* certainly was not for services rendered by the MEBA members of the former crew and required for efficient and economical operation of such vessels. In fact, they were paid for *non-operation* of the ships. * * *. [Emphasis in original.]

* * * * * *

Nor can the Board agree that denial of operating-differential subsidy on severance pay is contrary to the policy against retroactivity laid down by the Secretary of Commerce in his Order and Opinion of July 23, 1965. The instant disallowance for subsidy is plainly governed by the long standing definition of subsidizable wages of of-

---

44. *Id.* at 85.

45. Vol. III at 835.

46. This was the recommendation made in the report of the House Committee on Merchant Marine and Fisheries, heretofore quoted, when in 1956, in consideration of possible amendments to the 1936 Act, the committee concluded that MSB should make a "completely independent determination" that wages paid are fair and reasonable under

the statute and that collective bargaining should not be regarded as conclusive evidence of fairness, although entitled to weight. This is the recommendation that was adopted by Circular Letter No. 8–60, Nov. 9, 1960, but was not in support of any legislation reported by committee.

47. Vol. VI at 1972.

48. Vol. VI at 1978, 1980, 1981.

ficers and crews * * * [found in the 1957 Manual, supra.]

* * * * * *

* * * [S]everance pay to any officers or unlicensed crewmen paid in accordance with a union contract provision relating to sale or transfer foreign of a ship does not come within the definition of subsidizable wages, and therefore is not eligible for operating-differential subsidy rate-making or subsidy accrual.

Plaintiffs, thereafter, once again petitioned Secretary of Commerce Connor contending that such severance payments provided for in their contracts were "wages" since they were part of the crews' compensation earned working on a subsidized vessel. Mr. Connor accepted plaintiffs' protest and referred the matter to his general counsel for study.

While making clear that the question of whether severance payments were "fair and reasonable" was not being considered, the general counsel determined that severance payments were "wages" and, hence, eligible for subsidy. He rejected the board's contention that the severance payments were not compensation for the actual physical operation of the ships. The general counsel concluded that[49]—

* * * the Board's affirmation of the accounting instruction in question which would deny severance pay on legal grounds cannot be sustained. Whether the payments in a specific case are determined, as a matter of administrative discretion, to be fair and reasonable and eligible for subsidy reimbursement, is a separate matter.

* * * * * *

In further examining the issue, the Board might take into consideration (1) whether the employees receiving severance pay lose their jobs with the company because of the sale or trans-fer of a vessel to foreign registry, (2) whether they secure other employment, and (3) the reasonableness of payments to employees in a specific case.

The general counsel also made note of the July 23, 1965 decision of Secretary Connor in which he negated the MSB's opinions in Dockets A–14, A–15, and A–16. The general counsel suggested that the Secretary's "injunction against a retroactive application of a stricter standard," might be "relevant for consideration as to any severance payments made pursuant to a collective bargaining agreement entered into prior to July 23, 1965."[50]

Secretary Connor adopted the opinion of his general counsel on November 25, 1966. Docket A–25 was remanded to the MSB for withdrawal of Accounting Instruction No. 39 and reconsideration of this issue.[51]

### Docket A–25 (Revised)

The board was in no hurry to respond to the Secretary's remand order. In April 1967 the board informed all subsidized operators that it would "shortly conclude its reconsideration of the issue of severance pay." A similar announcement was issued by the board in late November 1967. On May 27, 1968, plaintiffs sent a letter to the board disputing the necessity for the board to make some of the factual inquiries suggested in the October 12, 1966 report of the general counsel and requesting an opportunity "to submit evidence and argument bearing upon the issues mentioned in the General Counsel's opinion and on any other issues * * * present" if the board decided to make such an inquiry. The board, however, made no response to plaintiffs' requests. Instead, on August 8, 1968, it finally issued a new opinion, Docket No. A–25 (Revised), ignoring the Secretary's

---

49. *Id.* at 1997–998.

50. Memorandum from general counsel to Under Secretary for Transportation, Oct. 12, 1966. [Vol. VI at 1998.]

51. Order In the Matter of Maritime Subsidy Board Docket No. A–25, Severance Pay for Transfer or Sale of a Vessel to Foreign Registry, Nov. 25, 1966. [Vol. VI at 1984.]

directive respecting wage review panels. In its discussion of the issues in Docket A–25 (Revised), the board reaffirmed its right to review the results of collective bargaining, indicated again that the results of such bargaining could not be considered, ipso facto, fair and reasonable, and found that the board had a duty to determine whether, as a matter of administrative discretion, payments for specific items could be considered "fair and reasonable" under section 603(b) of the 1936 Act and article I–4 of the ODS agreements, and consequently whether such payments would be eligible for subsidy reimbursement.

The board reviewed, in full, the history of the AMMI–MEBA Shipman plan and made the following determinations: (1) The Shipman award went beyond the limits staked out for the arbitrator in section 43, *supra*, of the 1958 AMMI–MEBA agreement in that the award disregarded the question of whether a permanent job loss was involved in each instance of severance payment; (2) the Shipman award was not addressed to the purpose of protecting employees against job loss since section 43 of the 1958 AMMI–MEBA agreement only applied to sales or transfers foreign; (3) the members of the crews of the *Santa Rosa* and *Santa Paula* who colected severance payments suffered no loss of employment; (4) the so-called "severance pay" clause was in reality only a "penalty clause" for sales of ships to foreign registry; and (5) the other severance payment plans contained in other collective bargaining agreements did not match up with the normally understood purpose of severance payments in that the payments made under the plans were not made to the individuals displaced, but were made to unions or union-established funds.

The board discounted the arguments in favor of subsidy payments advanced by plaintiffs and determined that[52]—

* * * the type of severance payments applicable in the case of the SSs *Santa Rosa* and *Santa Paula* were clearly of the *penalty type*, and are not fair and reasonable and eligible for subsidy support. * * *. [Emphasis supplied.]

The board made reference to severance plans operative under other union agreements, particularly the NMU agreement, and indicated that it would have to be in possession of all the facts in each particular case in order to rule on the eligibility of subsidy payments.

The board also took it upon itself to detail, ex parte, the criteria which *"would be appropriate* for determining the fairness, reasonableness and eligibility for subsidy reimbursement of severance payments."[53] [Emphasis supplied.] The board summed up its consideration of Grace's reimbursement application by making two points:[54]

* * * the lump-sum penalty severance payments paid by Grace Line Inc. to the engineers on the old SSs *Santa Paula* and *Santa Rosa* are not fair and reasonable, and are ineligible for subsidy.

* * * so-called severance payments, based on the sale or transfer of a vessel to foreign registry, can be determined by this Board to be fair and reasonable only under circumstances where the employee(s) affected suffers economic loss resulting from such sale or transfer and the aggregate amount of such so-called severance payment is not excessive in view of such economic loss.

█ As published, the surprise ex post facto severance pay plan adopted by the MSB did not cover any of the plans which were adopted as a result of exhaustive, protracted, intricate, often bitter collective bargaining between plaintiffs and the various maritime employee unions and as a result of Government

52. Vol. VI at 2032.

53. *Id.* at 2029–30.

54. *Id.* at 2039–40.

pressure to settle the labor disputes. The board gave no consideration to plaintiffs' inability to avoid the obligations so incurred. The effect of the board-published plan was to render non-subsidizable all Shipman severance plans agreed to during the 1958 and 1961 rounds of collective bargaining in the maritime industry. Plaintiffs petitioned Secretary of Commerce Smith for a hearing and review but he denied the petition. A petition for reopening was filed with and denied by the board and its decision became final. Defendant has asserted a second affirmative defense of failure by plaintiffs, except Prudential-Grace, to exhaust the administrative remedies. In view of defendant's position that under Docket A–25 (Revised) and Accounting Instruction No. 39 (2d Revision) the severance plans here in issue cannot qualify for reimbursement, the defense of failure to exhaust is without merit.

On July 23, 1969, MARAD issued Accounting Instruction No. 39 (2d Revision) informing all subsidized operators that the newly announced severance pay standards, detailed in Docket No. A–25 (Revised), would be applicable to the entire industry."

During this entire period other subsidized operators had repeatedly submitted requests for subsidy reimbursement arising out of sales or transfers of vessels to foreign registry. The SS *America,* owned by United States Lines (USL), terminated her final voyage and was sold to foreign interests with MARAD approval on October 27, 1964. As a result of the sale, USL made severance payments totaling $401,208.64 and thereafter submitted a request for reimbursement of this amount to MARAD. USL also made contributions to the NMU Employment Security Account[55] both before and after the sale of the SS *America,* and portions of these payments were used by NMU for severance benefits. It was not until September 26, 1969, that MARAD informed USL that a refund would have to be made for its contributions to the NMU fund which had been used by NMU for severance benefits.[56]

American President Lines, Inc. (APL), also claimed severance pay subsidy reimbursement for sales to foreign registry of four of its ships. The SS *President Hoover* was sold.in 1964; the SSs *President Polk* and *President Monroe* were sold in 1965; and the SS *President Roosevelt* was sold in 1970. The total of the disallowed severance payments made as a result of the sales of the four vessels was $624,084.26.[57]

MARAD refused all severance pay subsidy reimbursement applications filed by Grace, APL and USL. In addition, Grace and USL were required to refund amounts previously received for past NMU fund contributions.[58]

On July 3, 1969, plaintiffs petitioned MARAD to clarify or reconsider Docket A–25 (Revised). This request was refused by letter of December 29, 1969.

55. In some cases payments were made by USL to the NMU Pension and Welfare Fund. Some of these payments were later turned over to the Employment and Security Fund by the trustees of the Pension and Welfare Fund.

56. Calculations made on the March 13, 1972 MARAD notice to USL indicated that USL had been ordered to return $315,194.16. In plaintiffs' petition, USL is said to have had to refund $559,074, which payments had been paid to USL for its payments to the NMU funds. [See plaintiffs' petition, para. 10(b), pp. 10–11.]

57. Kieckhefer affidavit, Vol. III at 861–67: *Hoover,* $99,603.87; *Polk,* $125,991.45;

*Monroe,* $131,214.07; and *Roosevelt,* $267,274.87. These figures included payroll taxes paid by APL on such severance payments. Plaintiffs' petition only alleges that $544,879.63 was paid for severance payments resulting from the sales of the four vessels. The above figures apparently do not include payments made to the NMU funds. [See petition, para. 10(b), pp. 10–11—and no mention of such payments in Kieckhefer affidavit.]

58. Refunds apparently were accomplished in part by defendant's withholding from subsequent payments due plaintiffs.

Plaintiffs were instructed to file their severance pay ODS reimbursement applications in accordance with Accounting Instruction No. 39 (2d Revision).

## CONCLUSIONS

■ In considering the issues involved in this case, we must first determine what legal relationships are suggested by the facts and, second, what scope of review ought to be applied to these relationships. This approach reveals that plaintiffs were not the beneficiaries of a grantor-grantee relationship. Rather, plaintiffs were parties to 20-year subsidy contracts with the United States.[59] Accordingly, plaintiffs' eligibility for subsidy is governed by the principles of contract law and not by the auguries of agency discretion. Both legislative history and decisions of this court support this conclusion. As early as 1938 a Senate Commerce Committee report rejected the notion that the 1936 Merchant Marine Act provided for "true" subsidies. Instead, the report referred to agreements made under the 1936 Act as "subsidy contracts."[60] Under such contracts the United States receives value in implementation of national policy for every dollar of consideration it gives. In Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 998, 184 Ct.Cl. 169, 184 (1968), this court stated that:

> Contracts for cooperation-differential subsidies are to be treated like any other commercial contract between the United States and a private party. [Citations omitted.] The defendant's rights and responsibilities under this contract are similar to those of a private individual who is a party to a contract * * *.

In Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 582, 188 Ct.Cl. 644, 667 (1969), this court was just as explicit in stating that—

> * * * [t]he Government has not chosen to grant subsidy when and if it deems it necessary; it has entered into a twenty-year contract with each of these companies under which it has assumed a number of obligations, and the shipowner has also given valuable consideration, * * *.

Since agreements entered into under the 1936 Maritime Act are truly contracts with the Government, they must be viewed by this court in accordance with the provisions of the Wunderlich Act, 41 U.S.C. § 322.[61] That Act "guarantee[s] at least a minimal measure of judicial review of administrative determinations under 'any contract entered into by the United States' * * *." [Emphasis in original.] 413 F.2d at 583, 188 Ct.Cl. at 669.

■■ It is a well-established principle of law that a "party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Pacific Far East, supra,* 394 F.2d at 998, 184 Ct.Cl. at 184; Fox Valley Eng'r, Inc. v. United States, 151 Ct.Cl. 228 (1960). Consequently, when a ship operator enters into a subsidy contract with defendant, both parties implicitly covenant not to act in an arbitrary or capricious manner in their dealings with each other under the contract. Any such action would amount to a clear abuse of the discretion granted to each party under the con-

59. For purposes of their motion, plaintiffs have provided the court with copies of some of the ODS agreements pertinent to our decision. These contracts are:

"No. FMB–49, between the United States and Grace Line, Inc., effective Jan. 17, 1958, terminating Dec. 31, 1977.

"No. FMB–50, between the United States and American President Lines, Inc., effective May 11, 1956, terminating Dec. 31, 1976.

"No. FMB–19, between the United States and United States Lines, Inc., effective Jan.

1, 1950, terminating Dec. 31, 1969. [This contract included the only copy of part II of the various ODS agreements between the United States and plaintiffs.]"

60. S.Rep.No.1618, 75th Cong., 3d Sess. 2–3 (1938).

61. "No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

tract. So, article I–4 of the contract, providing that all board determinations under that article are to be final, cannot stand where the discretion exercised by the board is invalidated by its abuse of discretion. Such provision attempts without authority to make the board's decision final on a question of law. Defendant's first affirmative defense based on this provision is without merit.

In a case involving judicial review for abuse of discretion, Moore-McCormack Lines, Inc. v. United States, *supra*, four American steamship lines sued to obtain judicial review of construction-differential subsidy (CDS) awards made under the 1936 Act by MARAD's MSB. Plaintiffs directed their attack only at the procedures employed by the MSB in reaching its decision. In considering plaintiffs' claim, the court (Davis, J.) rejected the Government's contention that no judicial review of either the substance or the procedures of a MARAD determination was allowed. The court indicated that such an argument was contrary to the legislative history of the Merchant Marine Act of 1936, the fundamental guarantees of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the terms of plaintiffs' contracts. The court examined the history of the 1936 Act and found that, at the very least, MSB determinations were reviewable for "abuse of discretion" or "gross abuse of discretion" and that these standards included failure to maintain minimal procedural requirements.

The court held that "procedural fairness required that plaintiffs be informed of the [MARAD] staff position on disputed issues, and * * * [be given] the opportunity to respond to * * * [the staff's] contentions before the Board made its final determination [on a particular matter]." 413 F.2d at 584–585, 188 Ct.Cl. at 671. The court specifically noted that plaintiffs' right to know its "adversary's case" was a fundamental element of procedural fairness. Because plaintiffs had not been granted the right to know MARAD's position on matters involving the fairness and reasonableness of CDS payments, the court concluded that the board's procedures were "so defective as to constitute a gross abuse of discretion," thus invalidating the board's decision. 413 F.2d at 587, 188 Ct.Cl. at 675.[62] The court did not base its decision on constitutional grounds. Rather, it found that the board procedures so fundamentally denied plaintiffs their rights under the Merchant Marine and Wunderlich Acts that it was not necessary for the court to rely on constitutional authority.

MARAD was also found to have abused its discretion in *Pacific Far East Line, Inc., supra*. There, MARAD revoked an operator's right to use one method of accounting to compute its excess profits and substituted another method. Under article II–16 of its ODS contract, Pacific Far East could not operate a nonsubsidized vessel in competition with its subsidized service without the express approval of the United States. Defendant had an interest in enforcing this section because of the terms of article II–28, a section required to be included in every ODS contract by 46 U.S.C. § 1176(5) (1964). Under article II–28, one-half of that portion over 10 percent of an operator's profits from subsidized operations over a 10-year period was to be "recaptured" by the Government.

Although nonsubsidized voyages were not referred to in article II–28, both parties argued that some nonsubsidized voyages should properly be included in the article II–28 formula. In administering their contract, both parties had included some nonsubsidized sailings in their recapture calculations. The trial judge agreed with the parties' contention and found that to the extent that a

---

62. It has been said that, "[t]he backwardness of [the Maritime Subsidy Board's] administrative procedure is appalling." American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696, 704 (1969).

nonsubsidized voyage was competitive with the subsidized service, article II–16 gave MARAD the right to determine a reasonable basis for including the financial results of nonsubsidized voyages in the article II–28 formula.

The recapture period in question in *Pacific Far East Line, Inc.,* involved the years 1953–62. In 1960, MARAD canceled a 1959 directive and ordered that the accounting method used to calculate excess profits for 1955–56 under article II–28 be changed. As a result, nonsubsidized sailings excludable under the formerly applicable accounting procedure were included for purposes of determining article II–28 excess profits. This change in procedures caused the amount of excess profits for the years in question to increase significantly.

The court found that MARAD had changed the method of accounting for 1955–56 in order to effectuate its "desire to increase its recapture interest," and did so outside the framework of the contract. 394 F.2d at 1001–1002, 184 Ct.Cl. at 189–190. It was also found that this action amounted to an abuse of the discretion granted to MARAD under article II–16. The court denied effect to the change in accounting methods and ordered that the amount of excess profits for the years in question be determined under the formerly applicable accounting method. In reaching its decision, the court noted that its analysis was supported by the pertinent legislative history since Congress, in enacting 46 U.S.C. § 1176(5) (1964), had been concerned with attracting private capital to invest in the maritime industry rather than with maximizing recapture through its choice of a particular accounting method.

Article I–4 of our plaintiffs' contracts provided that the subsidies paid to put American-flag shippers on a parity with their foreign-flag counterparts were to be determined by the MSB. These determinations, furthermore, were to be "final and conclusive." Defendant now uses these contract provisions to support its argument that the MSB had absolute discretion to determine finally whether an item of expense was "fair and reasonable" in and of itself. This court, however, cannot give its *imprimatur* to defendant's sweeping assertions. We have held on a number of occasions that "one who has a right under a statute, or under a legal doctrine implicit in a statute, does not effectively surrender that right by making a contract about it." American President Lines, Ltd. v. United States, 291 F.2d 931, 936, 154 Ct.Cl. 695, 705 (1961); Southeastern Oil Florida, Inc. v. United States, 119 F.Supp. 731, 127 Ct.Cl. 409 (1953), cert. denied, 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658 (1954); A. H. Bull S. S. Co. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520 (1952). Under contracts made pursuant to section 603(b), plaintiffs had a right to receive a subsidy not to exceed "the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense" as to which the board found plaintiffs to be at a substantial disadvantage in competition with foreign-flag operators. Pertinent legislative history reveals that in making its determination as to which items a plaintiff was at a substantial disadvantage, the board certainly had authority, under the "fair and reasonable" language of the statute, to choose between suggested costs of both domestic and foreign items when more than one cost was suggested for a particular item. While the board had authority to make such a determination, section 603(b) did not authorize it to determine unilaterally what the "fair and reasonable" cost of a particular item might be in the instance where it believed the cost agreed to by the parties for that item was not "fair and reasonable."

The words "fair and reasonable" were not included in the merchant marine bills introduced in Congress in 1935. Those bills made reference to "the difference in cost of insurance, maintenance, repairs, and the wages and subsistence of officers and crew * * *."

U. S. Senate Hearings, Merchant Marine Act, 1935, 74th Cong., 1st Sess. 99 (1935) (on § 505(c) of S. 2582 and H.R. 7521). The "fair and reasonable" language was suggested by the United States Shipping Board Bureau (SBB) during the House hearings on the bill. The SBB suggested that the "fair and reasonable" language be added to the construction subsidy provisions of the bill. The SBB stated: [63]

> Section 501: There is in many instances a *wide range* both of domestic costs of construction and foreign costs. In order to lay down a more precise and definite standard it is suggested that the words "difference between the domestic and foreign construction cost" in section 501(a)(3) be amended to read "difference between the fair and reasonable domestic and foreign construction cost" * * *. [Emphasis supplied.]

With reference to ODS costs, the SBB noted that the "qualification 'fair and reasonable' should also be made with respect to the term 'cost' as used in section 505(c)." [64]

■ This legislative history persuades us that the "fair and reasonable" language was inserted in the statute in order to deal with instances where a variety of cost estimates had been suggested for a particular expense item. In determining the meaning of statutory language, it is not sufficient to consider only the words in question. The purpose of the law and the circumstances under which the language was employed are also of prime consideration. Puerto Rico v. Shell Co. (P.R.) Ltd., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937); Sea-Land Service, Inc. v. United States, Ct.Cl., 493 F.2d 1357, at 1364 (1974). In the present context it would appear obvious that the "fair and reasonable" language does not authorize the board to look initially to the actual makeup of the labor charges for which subsidy is sought. This because, unlike the situation where one subsidizable item, such as maintenance, might provoke a "wide range" of cost estimates or the situation where plaintiffs would have more than one source for their labor supply, the labor charges required by the collective bargaining agreements represent the costs of the *only* available labor supply. This analysis necessarily rejects defendant's argument that the mere existence of the "fair and reasonable" language in the statute and contracts gives the board the right to review wage-related items out of the context of collective bargaining.

■ Neither can the board's determination under article I–4 be "final and conclusive." Section 2 of the Wunderlich Act specifically bars any Government contract from containing a provision "making final on a question of law the decision of any administrative official, representative, or board." 41 U.S. C. § 322. *See* Sea-Land Service, Inc. v. United States, *supra*, at 1361.

■ In determining whether the MSB abused its discretion under the 1936 Act and article I–4 of the contract, we must look at the question that was before the board from 1965 to 1968— whether plaintiffs were entitled to subsidies for severance payments made under the ship subsidy contracts. In its consideration of this question, the board first concluded severance payments were not "eligible" for subsidy under section 603(b). When the Secretary of Commerce reversed the board on this point, the board responded by going right to the question of whether such severance payments, as were made by plaintiff Grace in accordance with the terms of its labor contracts, were "fair and reasonable" in and of themselves. In taking this step, the board gave no weight to the fact that the severance payment provisions were part of labor agreements reached through arm's length,

---

63. To Develop an American Merchant Marine, Hearings on H.R.7521 and S.2582, 74th Cong., 1st Sess. 381 (1935).

64. *Id.* at 383.

good faith, collective bargaining between plaintiffs and defendant. This fatal flaw in the board's consideration leaves us with no choice but to conclude that the board grossly abused its discretion in deciding that plaintiffs were not entitled to subsidy reimbursement for severance payments made pursuant to their labor contracts. The effect of the board decision, if it is left to stand, would be to render the subsidy contracts meaningless and to frustrate the Act itself.

▮ This conclusion is not lightly reached. Section 603(b) of the Act and article I–4 of the contract, indeed, require that the board exercise its discretion in determining the fairness and reasonableness of subsidy payments. Our decision here does not deny that fact, nor does it deny the board's expertise in maritime matters. What we do decide is that the board, in reaching its decision, exercised its discretion contrary to contract law. Questions of law are for the court to decide independently of the board's conclusions thereon which have no finality. Sea-Land Service, Inc. v. United States, *supra*, at 1361; John McShain, Inc. v. United States, 462 F.2d 489, 492, 199 Ct.Cl. 364, 370 (1972); Corbetta Constr. Co. v. United States, 461 F.2d 1330, 1335–1336, 198 Ct.Cl. 712, 721–722 (1972); H. N. Bailey & Assoc. v. United States, 449 F.2d 387, 390, 196 Ct.Cl. 156, 162 (1971).

▮ In reaching the conclusion that the results of the collective bargaining under the contracts in this case were "fair and reasonable," we caution that we do not rest our holding on the mere fact that the wages in question were required by a collective bargaining agreement. Such a fact is not, in itself, sufficient to satisfy the standard of "fairness and reasonableness." Plaintiffs also have the burden of showing that the collective bargaining in question was conducted at arm's length, in good faith.[65] Where plaintiffs are able to carry this burden, as here, then to disregard the collective bargaining agreement in question is a gross abuse of administrative discretion which breaches the contract.

This holding finds support in opinions of this court and in decisions and regulations of administrative agencies. A series of tax cases in this court have held that "the value of the two properties exchanged in an arms-length transaction are either equal in fact, or are presumed to be equal." Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 189, 130 Ct.Cl. 166, 172 (1954); Jack Daniel Distillery v. United States, 379 F.2d 569, 579, 180 Ct.Cl. 308, 325 (1967); Southern Natural Gas Co. v. United States, 412 F.2d 1222, 1252, 188 Ct.Cl. 302, 352 (1969). Just as the taxpayers in the cited cases sought to obtain equal value for consideration given so, also, does an employer try to obtain the best labor situation for the wage he is willing to pay.

The court notes, also, that the principle giving the accolade of reasonableness to arm's-length bargaining in CPFF contracts is reflected in Armed Services Procurement Regulations providing that severance pay is allowable where such bargaining is demonstrated along with the other requirements of the pertinent ASPR. 41 C.F.R. 1–15.201–3. In Telecomputing Services, Inc., ASBCA No. 10644, 68–1 BCA ¶ 7023 at 32,466, the board observed:

> * * * we have previously said that the test of "reasonableness" of a given cost must be addressed, primarily, to the discretion and sound judgment of the contractor. The function of the contracting officer is to determine whether a given cost is reimbursable as an allowable cost, applying the terms of the contract and the applicable provisions of Part 2, Section

65. An instance of bad faith would certainly include a situation in which it could be shown that an operator agreed to a contract provision *only* because the operator knew that the Government subsidy would cover any increase in cost to the contractor resulting from the agreement. This would amount to collusion to defraud the Government.

XV, ASPR. If the cost does not violate the terms of the contract, and passes the tests of ASPR, the contracting officer should determine that the cost is allowable and approve it for reimbursement even if in his own judgment he would not have incurred such a cost for reasons that appear plausible to him.

A 1944 decision of the Comptroller General of the United States also approved severance pay reimbursement under a CPFF Government contract. A contract provision calling for severance pay had been approved by the National War Labor Board in 1943. The Comptroller General's decision indicated "the propriety of reimbursement * * * for such expenditures is determinable solely by reference to the provisions of the particular contract involved; * * *."[66] The decision indicated that[67]—

> * * * [u]nder the circumstances it is apparent that the contractor had no choice in the matter but to pay its employees the compensation stipulated by the collective bargaining agreement in order to secure the labor necessary for performance of its contracts.

A review of the history of this case makes it clear that plaintiffs conducted their bargaining in good faith at arm's length. Plaintiffs were required by law to engage in collective bargaining "in respect to rates of pay, wages, hours of employment, or other conditions of employment."[68] American citizen crews were required aboard subsidized vessels and these individuals could only be hired through the union hiring halls. Without a segment of its crew, a ship could not sail. Plaintiffs clearly had their backs to the wall in dealing with the unions. In such a forum the unions were able to exercise considerable economic pressure in collective bargaining. Plaintiffs did not shrink in the face of this union dominance, however. Only after east coast unions struck in 1958 did plaintiffs agree to submit the matter of severance pay to arbitration. The alternative was a continued strike over an issue that was not, in the totality of plaintiffs' costs, a major item.

Public policy, in fact, supports the concept of arbitration.[69] The Supreme Court also has indicated that "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960); accord, Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 241, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

Plaintiffs did not enter into collective bargaining as unknowing innocents. Their east and west coast representatives, AMMI and PMA, were professional labor negotiation organizations whose prime function was to act as a united and informed employer bargaining unit. In this way, the employers sought to hold concessions to unions to a minimum and make the best bargain possible.

Even after the Shipman award, the plaintiffs did not buckle under and agree to severance pay clauses in every instance. PMA was successful in keeping such a clause out of its contracts until 1961, and only agreed at that time in the context of Government intervention into bitter employer-union negotiations brought on by radical union demands. On the east coast, AMMI was successful in keeping an independent severance plan out of the 1961 AMMI–NMU agreement. The plan which the parties adopted was pursuant to considerable Government pressure.

The allegation that the cost of any increase in union or employee benefits, which plaintiffs might agree to in collective bargaining, would be borne by the

---

66. Docket B–39636, 23 Comp.Gen. 621, 622 (1944).

67. Id. at 623.

68. 29 U.S.C. § 159(a).

69. 29 U.S.C. §§ 171, 173; cf. Grace Line, Inc. v. National Marine Engineers' Beneficial Ass'n, 38 Misc.2d 909, 239 N.Y.S.2d 293 (Sup.Ct.1963).

Government is simply not true. Plaintiffs' bargaining groups were made up of both subsidized and nonsubsidized operators. Some sailings by plaintiffs were over nonsubsidized trading routes. Thus, plaintiffs' bargaining representatives had considerable incentive to hold labor costs to a minimum.

Plaintiffs did not give up their fight to hold down labor costs once the severance pay clause had been included in their contracts. When the SS *Santa Paula* and SS *Santa Rosa* were sold and severance demands were made, Grace contested those demands through arbitration and four levels of judicial review.

For its part, defendant does not deny that the collective bargaining conducted between plaintiffs and the unions in 1958 and 1961, and thereafter, was conducted at arm's length in good faith. Rather, it acknowledges that such was the case. In its instant motion for summary judgment, defendant states: "* * * Neither is plaintiffs' conduct in collective bargaining questioned." Further, the August 6, 1962 OGA memorandum, *supra*, reflects MARAD's own determination that the 1961 round of bargaining was beyond reproach.

 Once plaintiffs reached an arm's-length agreement with the unions, plaintiffs became bound by that agreement and were without authority to alter or amend unilaterally the terms of their agreement. Thus, the costs to plaintiffs became unavoidable. If plaintiffs had refused to pay such costs, the unions would have struck and the American merchant marine fleet would have been immobilized. This clearly would have frustrated the purpose of the 1936 Act, for that Act was designed to insure a vibrant American merchant fleet rather than to keep the Government's cost of maintaining such a fleet to a minimum. *See* Sea-Land Service, Inc. v. United States, *supra*, 493 F.2d at 1367.

 When the board rejected the results of the collective bargaining, under the circumstances of this case, it violated an implicit covenant not to act arbitrarily or capriciously with respect to matters under the contract. Plaintiffs violated no provision of their subsidy contracts when they agreed to severance pay clauses in the 1958 and 1961 rounds of collective bargaining. Plaintiffs had a right to expect the same behavior from the board as it performed its contractual duties and responsibilities under the ship subsidy agreements. The board's failure to so perform was a gross abuse of the discretion granted it under the subsidy agreements it had with plaintiffs and breached those contracts. Defendant's brief says that the board applied "an *ad hoc* solution to one of the innumerable situations left uncovered by the Act." Perhaps this is the best that can be said for it.

If the MSB is to be permitted to have the power to declare unfair or unreasonable a portion of an arm's-length, good-faith collective bargaining agreement, by ignoring the agreement altogether, as here, it will be able to impose a chilling effect on the operators' and the maritime labor unions' right to engage in collective bargaining. Just recently, the First Circuit rejected an attempt by the Federal Maritime Commission to disapprove, for regulatory purposes, a collective bargaining agreement. The court wrote: [70]

> It would seem at once apparent that the intrusion into, and possible conflict with, labor activities and the jurisdiction of the NLRB is more than theoretical. The Commission explained this away. "[T]he Examiner's fear * * * is groundless since no one is demanding any preapproval clearance of the negotiating positions of management during collective bargaining"; [record citation omitted] the "agreement must be filed for approval" only when consummated. Thus, paraphrasing

70. Boston Shipping Assn., Inc. v. United States and Federal Maritime Comm'n, 8 Pike & Fischer's Shipping Regulation Reports 20,828, 20,830–831 (1st Cir. May 31, 1972).

the maternal "hang-your-clothes-on-a-hickory-limb-but-don't-go-near-the-water" adjuration, feel free to negotiate your bathing suit purchase, and mother will decide later if you can wear it. * * *.

No one but the Commission finds this satisfactory. To, apparently, the Commission's surprise, the Department of Justice has filed a brief in this court taking extensive exception to its position. Without making a definitive ruling, we find Justice's brief forceful. We note, too, its concluding portion, quoting the disapproval of the Solicitor of the Department of Labor, and of the National Labor Relations Board.

\* \* \* \* \* \*

The latter said, in part, with respect to the Commission's suggestions that it was not interfering because it would only take a post hoc view,

> "The process of collective bargaining involves a give-and-take, with one party making a concession on one subject in return for obtaining a concession on another subject. It is difficult, if not impossible, for the parties to make a meaningful judgment as to the kind of bargain they are negotiating if one or more of the key provisions on which agreement turns is subject to invalidation by the Commission. * * *.

The Supreme Court, too, is conscious of the danger of the commission interfering in the delicate area of collective bargaining. In a case involving an overlap of attention by the Interstate Commerce Commission and the NLRB in a labor dispute, the court indicated that[71]—

> \* \* \* if either agency is not careful it may trench upon the other's jurisdiction, and, because of lack of expert competence, contravene the national policy as to transportation or labor relations. * * *.

The July 23, 1965 decision by Secretary of Commerce John T. Connor to reverse the MSB's actions in Dockets A–14, A–15, and A–16 should also have some bearing on the outcome of this case. The contracts at issue in the three MSB dockets were the same ones which we are concerned with here. It is difficult to conceive how some items bargained for in 1963, disallowed in 1965, and then permitted because of the undue hardship which might be caused by a retroactive ruling regarding such items, could be that distinguishable from an item such as severance pay bargained for in 1958 and 1961 and disallowed in 1965.

The fact that the 14 employees of the SSs *Santa Rosa* and *Santa Paula* suffered no loss of employment while at the same time qualifying for severance payments is of little or no importance in determining the outcome of this case. As has been noted, what the court is concerned with here is the contract between plaintiffs and the MSB. Those parties bargained for a ship subsidy agreement. As part of that agreement, plaintiffs were required to bargain in good faith, at arm's length, for their labor supply in a controlled labor market. Since we have found that plaintiffs did bargain in good faith, at arm's length, it is not necessary that we review the actual terms or application of the labor contracts between plaintiffs and the operators. In the context of this case then, the severance payments to employees who suffered no job loss can only be described as a "red herring" after which we should not fish.

Defendant's proposed interpretation of section 603(b) and article I–4 also would render unnecessary another provision of the ship subsidy agreements. Article II–22(g) of those agreements provides that:[72]

71. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 173, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962); *also see* p. 172, 83 S.Ct. p. 248.

72. Vol. VI at 1946.

Notwithstanding any other provision of this agreement, no payment of operating-differential subsidy shall be made with respect to any of the following:

\* \* \* \* \* \*

(g) Expenses to the extent found by the United States to have been clearly improvident, unnecessary or excessive;

\* \* \* \* \* \*

 It is this court's opinion that article II–22(g) adequately serves the purpose for which defendant advocates using the "fair and reasonable" clause. That is, it provides the board with sufficient authority to reject an operator's request for subsidy for an expense clearly beyond the ken of a subsidy contract. Since it is uncontested that the severance payments here in question were the result of good faith, arm's-length collective bargaining, they are, as a matter of law, neither "improvident, unnecessary or excessive."

The 1970 Congress enacted a series of amendments to the Merchant Marine Act, Pub.L. 91–469, 84 Stat. 1018. The effect of these amendments was such that the controversy we are dealing with in this case could not arise under the amended statute. The 1970 Act provided for the establishment of a "wage index system" for computing subsidies and eliminated any necessity of determining the "fair and reasonable nature of American costs. H.Rep.No.91–1073 on H.R. 15424, 91st Cong., 2d Sess. 40–41 (1970); 46 U.S.C. § 1173(c)(1)(D). The wage index system was designed to provide subsidies up to base period costs, as computed through the use of the wage index compiled by the Bureau of Labor Statistics, for each period in question. If annual increases in an operator's costs exceeded the base period figure, the operator would not be reimbursed for the increase above the base period ceiling. If the operator, on the other hand, was successful in keeping its costs below the applicable base period figure, the excess between the operator's cost and the base period figure would be paid to the operator. The wage index system of computing subsidies thus provided considerable incentive for an operator to keep its costs to a minimum. At the same time, the new system gave labor unions a clear indication of how much they might be able to raise their wages in any particular year. Wage increases above the base period figure clearly would lead, in the long run, to an increase in the sales foreign of American-flag vessels, thus reducing available job opportunities for American maritime workers.

At the same time it introduced the wage index system, Congress also provided a definition of "collective bargaining" which stipulated that *all costs* arising out of a collective bargaining agreement, including "payments required by law to assure old-age pensions, unemployment benefits, or similar benefits" would be proper for subsidy. 46 U.S.C. § 1173(c)(1)(A). This language legitimized the "fairness and reasonableness" of a collectively bargained item, such as severance pay, for periods covered by the new amendments to the Merchant Marine Act. S.Rep.No.91–1080 on H.R. 15424, 91st Cong., 2d Sess. 35 (1970).

With the new legislation, Congress has accomplished what the MSB attempted in disallowing severance pay subsidies in the present case. The MSB, however, was bound by its own contracts and the terms of the 1936 legislation in the instant case. By establishing a new method under which ODS payments would be calculated, Congress has put a check on what for a period of time appeared to be an uncontrolled labor problem in the merchant marine industry. One of the purposes of the original 1936 Act was to improve the working conditions of American merchant marine employees. That purpose has been accomplished and American seafaring employees have now achieved a parity of wages and benefits with the rest of the American working force. To accomplish this, the efforts by Congress to impose some control on the monopoly one-sup-

plier labor market existing in the merchant marine industry are understandable and of valid legislative purpose.

■ As already noted, defendant had the necessary discretion to administer its subsidy contracts with plaintiffs. Defendant, however, abused this discretion in concluding that the severance payments were not subsidizable under article I–4 of the subsidy contracts. Defendant had no authority to render such an opinion which would be final. The question concerned a matter of law— whether severance payments were fair and reasonable—and as such was a matter reserved for final decision in this court. 41 U.S.C. § 322; Sea-Land Service, Inc. v. United States, *supra*; John McShain, Inc. v. United States, *supra*; Corbetta Constr. Co. v. United States, *supra*; H. N. Bailey & Assoc. v. United States, *supra*.

Defendant's assertion that the severance pay plan announced in Accounting Instruction 39 (Revised) was the product of agency "rule-making" also cannot be countenanced. Without getting to the issue of whether AI–39 (Revised) was "rule-making" or "adjudication," it is possible for this court to decide that an agency cannot by "rule" unilaterally amend its contractual obligations. In States S.S. Co. v. United States, 428 F. 2d 832, 192 Ct.Cl. 795 (1970), this court refused to permit another MARAD Accounting Instruction (No. 37, issued in 1967), interpreting the 1962 investment credit tax statute, to increase the amount of "recapture" which the Government might recover pursuant to 46 U.S.C. § 1176(5) and the terms of the contract between States and MARAD. States had formerly included the full amount of its federal taxes in its costs of operation for purposes of figuring its net profits subject to "recapture," and did not reduce this figure by the amount of its 7 percent federal investment tax credit. Accounting Instruction No. 37 required States to make such a reduction in its costs of operation figure. In its opinion the court determined that the investment credit was intended to apply

to both regulated and nonregulated industries. It further determined that plaintiff had not consented to an increase in the amount of its profits subject to recapture. The court explained its decision by noting that even though plaintiff had agreed in its ODS contract, to make its recapture computations in accordance with Government accounting instructions, it "could not have been within the contemplation of either of the parties to bind themselves to any *future* changes in the tax laws, no matter how far-reaching or important." [Emphasis in original.] 428 F.2d at 837, 192 Ct.Cl. at 804. Once the defendant entered into its contract with plaintiffs, its duties and obligations were similarly fixed by the terms of those contracts.

■ Many Government contract suits which come before this court involve controversies arising out of contracts containing a disputes clause. By the terms of a disputes clause, parties agree to bring all factual disputes arising under the contract to the Government contracting officer assigned to the contract. The contracting officer's decision is final on any factual matter unless appealed by a contractor within 30 days to the head of the department administering the contract or his authorized representative, normally a board of contract appeals. Both the contractor and the Government then have an opportunity to present their views of the controversy in a hearing before the board. Where plaintiffs disagree with the determination of the agency under the disputes clause they may bring their appeal to this court under Wunderlich Act standards. 41 U.S.C. §§ 321, 322.

Plaintiffs' contracts at suit here contained no disputes clause. As such, plaintiffs had no opportunity to present their side of this controversy to the MSB or any other MARAD body in a disputes procedure. Plaintiffs did file a request, in 1968, to submit evidence supporting severance payments if the MSB intended to review its initial determination that severance payments were ineligible for subsidy but the MSB ignored

**586**

plaintiffs' request and issued a new opinion on August 8, 1968, disallowing severance pay subsidy on the ground that such payments, as were provided for in plaintiffs' labor contracts, were not "fair and reasonable."

 In cases where no disputes clause exists or where a claim arises outside the scope of a disputes clause, plaintiffs are authorized to bring suit in this court. 28 U.S.C. § 1491 confers jurisdiction on this court of actions founded upon contracts with the United States. Whereas this court is permitted to give only a limited review to factual determinations made by boards of contract appeals in disputes clause proceedings, de novo consideration must be accorded those cases arising outside the disputes framework for they are breach claims. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

In Len Co. & Assoc. v. United States, 385 F.2d 438, 181 Ct.Cl. 29 (1967), this court reviewed the law applicable to the bringing of contract claims. The court indicated that:[73]

> The constitution governing the mode of resolving the parties' disputes is always the particular contract made by the contractor and the Government. * * *. To the extent that complete relief is available under a specific provision [of the contract] * * *, the controversy arises under the contract and is subject to initial administrative resolution as provided in the normal "Disputes" article. But if a fair reading of the particular contract shows that the specific dispute has not been committed to agency decision, the claims are then for a "pure" breach of contract and are considered *de novo* in this court [footnote omitted].

 Applying this rationale to the instant case, we must conclude that the absence of any disputes clause, to say nothing of matters "not * * * com-

mitted to agency decision," makes plaintiffs' claims justiciable only in this court and not before the MSB. This analysis is supported by this court's opinion in Wilco Floor Serv., Inc. v. United States, 197 Ct.Cl. 902 (1972), wherein the court approved a de novo trial on account of the absence of disputes clauses in the pertinent Government contracts.

 In view of the contractual nature of this controversy and the absence of any disputes procedure in the pertinent contracts, it is our conclusion that the MSB's Docket A–25 (Revised), wherein the board determined that the severance payments in question were not "fair and reasonable," is not entitled to any of the presumptions which might normally attach to the opinion of an administrative body. The MSB's opinion, in sum, is entitled to no greater weight than that which normally attaches to the opinion of one party to a dispute. Plaintiffs did not agree to allow defendant to determine unilaterally the outcome of controversies arising under the subsidy contracts. Absent such an agreement, defendant cannot ascribe such authority to itself.

### Remand to Trial Division

Since we have determined that the only substantive question now before this court involves the interpretation of a Government contract—whether plaintiffs' cost for severance payments were fair and reasonable under article I–4 of the contract—and since we have determined that this question must be answered in plaintiffs' favor, it is now necessary to remand this matter to the trial division so that damages may be determined pursuant to Rule 131(c)(2) of this court. Where no disputes clause is involved, as here, and where our jurisdiction rests on 28 U.S.C. § 1491, referral to the trial division for further proceedings to determine damages is the only proper and available course.

73. 385 F.2d at 441–442, 181 Ct.Cl. at 36. *Accord,* Bird & Sons v. United States, 420 F.2d 1051, 1054–1055, 190 Ct.Cl. 426, 432 (1970).

Accordingly, defendant's motion for summary judgment, or alternatively for remand to the board, is denied. Plaintiffs' cross-motion for summary judgment is granted, and judgment is entered for plaintiffs. The determination of the amount of recovery is reserved for further proceedings in accordance with Rule 131(c)(2).

COWEN, C. J., concurs in the result.

**FARRELL LINES INCORPORATED** *

v.

The **UNITED STATES.**

No. 42–72.

United States Court of Claims.

June 19, 1974.

---

\* This suit is one of thirteen similar cases filed in the court founded upon essentially the same facts. This case has been selected as a test case with the understanding that the other cases will be governed by the disposition of this action to the extent that the claims sued upon in the other cases are essentially the same.